696 So.2d 709 (1997)
Floyd W. DAMREN, Appellant,
v.
STATE of Florida, Appellee.
No. 86003.
Supreme Court of Florida.
May 8, 1997.
Rehearing Denied July 8, 1997.
*710 Nancy Daniels, Public Defender, Second Judicial Circuit, Tallahassee, and Teresa J. Sopp, Jacksonville, for Appellant.
Robert A. Butterworth, Attorney General and Curtis M. French, Assistant Attorney General, Tallahassee, for Appellee.
SHAW, Justice.
We have on appeal the judgment and sentence of the trial court imposing the death penalty on Floyd W. Damren. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.
Floyd W. Damren entered the grounds of R.G.C. Mineral Sands, stole equipment, and told a friend: "There [is] ... some more good stuff down there I'd like to get." Several weeks later, after drinking beer with friends, Damren returned at night, May 1, 1994, with an accomplice, Jeff Chittam, and the two burglarized the electrical shop in the maintenance barn. As Chittam was taking a break, he was confronted by the duty electrician, Don Miller. Damren then snuck up behind Miller and struck him with a steel pipe. As Miller fell to the ground, he pleaded for mercy, saying he was going on vacation the next day and was taking his grandson fishing. Chittam too begged Damren not to hurt Miller any more. Damren paced the floor for a while, then proceeded to bludgeon Miller. As Damren was dragging Miller's body across the floor, the shift supervisor, Michael Knight, entered the building and hollered at Damren. Damren turned, looked Knight "dead in the eye," and came at him with the pipe. Knight ran from the building, yelling. Damren fled. Miller died later that night.
Knight immediately identified Damren to police (Damren had lived in Knight's neighborhood since childhood) and Damren was arrested and charged with first-degree murder, armed burglary, and aggravated assault. At trial, the medical examiner testified that the victim, Miller, had been struck a minimum of seven times on the head and four on the body. Four of the head wounds would have caused unconsciousness and death, including one "chopping wound that basically goes from the base of the nose all the way across the head," breaking open the skull and exposing the lacerated surface of the brain underneath. Miller had numerous defensive wounds.
Evidence against Damren included the following: Knight testified as to what he saw when he entered the maintenance building that night; several witnesses testified that Damren had made incriminating statements to them following the murder; and blood stains on Damren's pants matched Miller's blood. Chittam was not charged, nor did he testifyhe became the victim of a separate homicide, in which Damren was charged.
Damren relied principally on an intoxication defense, arguing that he had drunk several beers that day. He was convicted as charged. During the penalty phase, numerous relatives and friends testified on Damren's behalf. The jury voted unanimously for death and the judge imposed a sentence of death based on four aggravating circumstances,[1] *711 no statutory mitigating circumstances, and four nonstatutory mitigating circumstances.[2] Damren raises nine issues.[3]
Damren first claims that during the guilt phase, the State presented testimony that Damren had gone to the mine several weeks before the murder and stolen a portable generator from a truck. This prior crime, he asserts, was neither similar nor relevant to the present crimes and the court erred in admitting the testimony. We disagree. Damren's prior act was integrally connected to the present crimes because it supported the State's theory that Damren possessed the specific intent to burglarize the premises.[4] This theory was advanced in response to Damren's defense that he was too drunk to form the requisite specific intent to commit the burglary. See Hunter v. State, 660 So.2d 244 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996). We find no error.
Damren next claims that the court erred in failing to give the requested standard jury instruction concerning "similar fact" evidence in relation to the prior crime discussed above. We disagree. Although a limiting instruction is required under section 90.404(2), Florida Statutes (1993), for "similar fact" evidence, none is required under section 90.402 for "relevant" evidence. See Layman v. State, 652 So.2d 373 (Fla.1995). Evidence of Damren's prior crime was relevant, not similar fact, evidence, as explained above. We find no error.
During the rebuttal portion of the prosecutor's closing argument in the guilt phase, the following took place:
MR. SHORSTEIN [prosecutor to the jury]:
....
On intoxication, if it's truefirst of all, intoxication is not a defense. Mere intoxication is not a defense. No one will tell you that. It isit can be a defense if you cannot form a mental state; that is, if you don't know you're killing somebody or you don't know you're burglarizing or stealing.
It's hard to envision, but if you believe
MR. CHIPPERFIELD [defense counsel]:
Your Honor, I apologize. I have to object to that characterization of the law. I think it misstates it. That would be an insanity defense.
....
MR. SHORSTEIN:
....
How drunk would you have to be not to know you've committed a murder or a burglary? I don't know. The jury has to decide that. And if you're convinced or if we have failed to convince you beyond a reasonable doubt
MR. CHIPPERFIELD: Your Honor, excuse me. I must object again. It's the same argument I objected to earlier. I think it takes the intoxication to a higher level than that; insanity. I would object to characterizing it that way.
Damren claims that these comments by the prosecutor are a misstatement of the law. We agree. The prosecutor's statements place a higher burden on the defendant than *712 is actually required under the traditional intoxication defense.[5] The statements, however, were not emphasized and the jury was properly instructed before retiring. Further, counsel for both the State and the defendant read the standard instruction to the jury. We find the error harmless.
Damren next asserts that the court erred in allowing Miller's wife[6] and daughter[7] to read prepared statements to the jury *713 during the penalty phase. We disagree. Section 921.141(7), Florida Statutes (1993), allows the State to introduce "victim impact" evidence, showing "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." The statements of Miller's wife and daughter comport with this statute. See Bonifay v. State, 680 So.2d 413 (Fla. 1996). We find no error.
Damren claims that the court erred in allowing Wendy Hedley, Tessa Mosley, and Joanne Waldrup to testify in the penalty phase as to what Chittam said about the murder when he returned to Hedley's trailer immediately following the killing.[8] We disagree.
The State argued the following in its proffer of Chittam's statements to the trial court: 1) Hearsay is admissible in the penalty phase;[9] 2) Damren was accorded a fair opportunity to rebut Chittam's statements because Hedley, Mosley, and Waldrup were available for cross-examination;[10] 3) Chittam's statements were corroborated by other witnesses who also were available for cross-examination;[11] and 4) Chittam himself was unavailable for cross-examination only because Damren, in order to silence him, had beaten him to death with a hatchet shortly after he made the statements. The State also argued that the statements were admissible in any event as excited utterances.[12]
Our review of the record shows no abuse of discretion in admitting Chittam's statements. See Blanco v. State, 452 So.2d 520, 523 (Fla.1984). We addressed a similar deceased-declarant scenario in Spencer v. State, 645 So.2d 377 (Fla.1994), wherein the out-of-court statements of the murder victim (describing a prior attack and threat by the defendant) were admitted in the penalty phase via the in-court testimony of a police officer. We found it sufficient under section 921.141(1), Florida Statutes (Supp.1992), that "Spencer was ... given an opportunity to cross-examine the officer." Id. at 383-84. Damren was accorded the same opportunity. See also Waterhouse v. State, 596 So.2d 1008 (Fla.1992).
Further, Chittam's statements fall within the excited utterance exception to the hearsay rule. The statements were made shortly after the murder of Miller;[13] Chittam was in a highly agitated state over the burglary gone awry when he made the statements;[14] and he was in dire fear for his own life because of the killing he had just witnessed.[15] As noted above, Chittam was *714 killed within hours of making the statements. We find no error.[16]
We find the remainder of Damren's claims to be without merit[17] or any error to be harmless.[18] We affirm the convictions and sentences, including the death sentence.
It is so ordered.
OVERTON, GRIMES and WELLS, JJ., concur.
KOGAN, C.J., concurs in result only as to conviction and dissents as to sentence.
HARDING, J., concurs as to conviction and dissents as to sentence.
ANSTEAD, J., concurs in part and dissents in part with an opinion, in which KOGAN, C.J., and HARDING, J., concur.
ANSTEAD, Justice, concurring in part and dissenting in part.
This case must be remanded for a new penalty phase proceeding because of the erroneous receipt of hearsay evidence in violation of the defendant's right of confrontation. The admission of testimony of three witnesses in this case relating co-defendant Chittam's statements detailing appellant's participation in the murder clearly violated the defendant's right to cross-examination under the Confrontation Clause of the Sixth Amendment of the United States Constitution. The fact that Chittam's statements were made to his friends and not to police doesn't change the fact that Damren was not able to cross-examine Chittam, the declarant, at trial.
Our decision in Hall v. State, 381 So.2d 683 (Fla.1980), and Gardner v. State, 480 So.2d 91 (Fla.1985), control the disposition of this issue. In Hall, we analyzed at length the right of cross examination secured by the Confrontation Clause and emphasized:
The crux of a Bruton violation is the introduction of statements which incriminate an accused without affording him an opportunity to cross-examine the declarant. It is immaterial whether denial of this opportunity occurs because the statements are introduced through the testimony of a third party or because the speaker takes the stand and refuses to answer questions concerning the statements.
Id. at 687. We applied that rule to the sentencing phase of a capital trial in Gardner where, as is the case here, a third party testified in the sentencing phase about the accomplice's statements incriminating the accused. We explained the confrontation problem as follows:
In the sentencing phase we find merit in Gardner's argument that the jury heard inadmissible evidence when the trial court allowed a police officer to testify about Tyler's statements incriminating Gardner as the one who stabbed the victim. Tyler did not testify at trial and Gardner could not confront or cross-examine her on the statement. In Engle v. State, 438 So.2d 803 (Fla.1983), this Court held that a new sentencing hearing would be required where the trial court considered the incriminating confessions and statements of a co-defendant before sentencing the defendant to death. Consideration of such evidence during sentencing violates the due process rights of a defendant who had no opportunity to cross-examine and confront the co-defendant. Id. at 813-14. Engle applies with equal force here, where *715 the jury considered similar inadmissible and prejudicial evidence before recommending the death penalty.
Id. at 94 (footnote and citations omitted). Moreover, section 921.141(1), Florida Statutes (1995), expressly states that there is a limit to the type of hearsay evidence that can be admitted in the penalty phase of a capital trial:
Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida.

KOGAN, C.J., and HARDING, J., concur.
NOTES
[1] The court found the following: Damren had previously been convicted of a violent felony; the murder took place during commission of a burglary; the murder was especially heinous, atrocious, or cruel; and the murder was committed in a cold, calculated, and premeditated manner.
[2] The court gave "little" or "some" weight to the following: The underlying burglary did not involve a preconceived plan to use weapons or violence; Damren did not act alone; Damren had an alcoholic father and had an alcohol problem himself; Damren had been a good prisoner.
[3] Damren claims the court erred in the following matters: 1) in admitting similar-fact evidence; 2) in refusing to give the standard Williams rule instruction; 3) in overruling Damren's objection to the prosecutor's remarks about the intoxication defense; 4) in admitting victim-impact evidence; 5) in admitting Chittam's hearsay statements; 6) in finding that the murder was heinous, atrocious, or cruel; 7) in finding that the murder was cold, calculated, and premeditated; 8) in failing to find certain mitigation; 9) in imposing a death sentence that is disproportionate.
[4] Damren's words are of key relevance: "There is ... some more good stuff down there I'd like to get."
[5] The standard jury instruction on voluntary intoxication reads in relevant part:

However, where a certain mental state is an essential element of a crime, and a person was so intoxicated that he was incapable of forming that mental state, the mental state would not exist and therefore the crime could not be committed.
As I have told you, [the intent to (specific intent charged) ] [premeditated design to kill] [(other mental state) ] is an essential element of the crime of (crime charged).
Therefore, if you find from the evidence that the defendant was so intoxicated from the voluntary use of [alcohol] [drugs] as to be incapable of forming [the intent to (specific intent charged) ] [premeditated design to kill] [ (other mental state) ], or you have a reasonable doubt about it, you should find the defendant not guilty of (crime charged).
Fla. Std. Jury Instr. (Crim.) 45e (brackets in original).
[6] The wife testified as follows:

Don has touched many people, especially his family.
Don was the only child of Virginia and Donald Miller. They moved here to be close to their son in their retirement years. Now that is gone.
Don has two children; Terri, age 27 at [Don's] death and Jeff, age 23 at [Don's] death. True, they are grown, but that does not mean that they don't miss having him here to go to for advice or a laugh or a hug. Don was very proud of his kids. They were always very important to him. He loved them as only a father could. When Don was killed that also took my life as I knew it. So, in a sense they have lost not only their father but their mother too.
Jeff has had a hard time dealing with his father's death. He had transferred back to Indiana to finish his college education.
Terri has had to deal with a lot. Trying to be strong for them and for me.
Don and I started going steady when we were 14 years old, married at 18. At the time of his death we had been married for 28 years. Don was killed in the prime of his life. He was only 46 years old. We were planning a cruise in June of 1995, sort of the honeymoon we never had. Don was my life, he was my best friend.
The last conversation I had with him on May 1, 1994, was when he was leaving to go back to the mine. I had asked him if he would be long and he told me it didn't matter because at 7:00 that next morning he would be on vacation and he'd be home by 8:00 a.m. Don didn't get to come home.
Don worked hard all his life. Some of his co-workers had offered to take his call duty the night of May 1, 1994, because he was supposed to start vacation the next day. He wouldn't let them. He felt it was his responsibility. He was heavily involved with the Union, his main concern being safety in the work place.
He was active with an organization called A.B.A.T.E. (American Bikers Aiming Toward Education). A.B.A.T.E. is a political organization but they also put on numerous benefits for needy families. A big majority of these were held at our house. They also sponsor blood drives. He participated every year in Toys for Tots at Christmas time.
Don touched many people in the short nine years of being in Florida. He is greatly missed by friends and family.
[7] The daughter testified as follows:

Don Miller was more than just a case number. He was my dad. He had a family. He used to play catch with my son, Nicholas, who was seven at the time, getting him ready for his first baseball game. He never got to see that game. On the 2nd of May, the day after my father was killed, he had planned to go fishing with my son. That will never happen now.
When my daughter, Stephanie, turned five he took her to Merle Norman at the mall to get her ears pierced. That was her "special" gift from her Papa. He told her that every year on her birthday he would take her shopping for earrings. He never got to do that either. She was still only five years old when he died.
These two grandchildren were the "apple of his eye." Now he can't be there for them as they grow up like he always was for me and my brother. These kids are now six and eight and are in counseling through their school to try to learn how to deal with their grief and to understand death. A lot of their childhood has been taken away. Not only have they lost their Papa, they have also been forced to see the ugly side of life at a very young age.
My dad had many friends from all walks of life. He fit in almost anywhere. I can think of 25 to 30 of his good friends off the top of my head. He was the type of person who was always willing to help you out as long as you were trying to help yourself. He had respect for other people and their feelings and he got respect in return.
This whole ordeal has taken its toll on our entire family, we've all suffered such a loss. We've lost our child, husband, dad, grandpa and friendwe never got a chance to say goodbye.
[8] Chittam gave Hedley a detailed account of the events at the mine that night. Mosley and Waldrup overheard fragments of Chittam's conversation with Hedley. Hedley testified in detail as to what Chittam said, and Mosley and Waldrup testified briefly as to what they overheard.
[9] See § 921.141(1), Fla. Stat. (1993) ("Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.").
[10] See id.
[11] Other witnesses verified Hedley's account on key points: 1) Miller (the victim) was planning to go on vacation the next day and take his grandson fishing, just as Hedley testified; 2) Damren used a metal pipe to bludgeon Miller, just as Hedley testified; 3) Miller was paged during the attack, just as Hedley testified; 4) a fourth person (Knight) happened on the scene and Damren chased him from the building with a pipe, just as Hedley testified; and 5) the medical examiner's testimony was consistent with Hedley's.
[12] See § 90.803(2), Fla. Stat. (1993) (The following is excepted from the hearsay rule: "A statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.").
[13] According to Hedley and Mosley, Chittam's statements were made within minutes of the crime. According to Waldrup, the statements were made within several hours of the crime.
[14] Hedley testified: "He was scared and acting nervous"; he was crying "a lot"; "Jeff was kind of hysterical"; "He was crying. He was really upset." Mosley confirmed that he was "upset [and] excited," and that he was "[s]cared, nervous, upset." Waldrup testified: "He was scared."
[15] Hedley testified: "He was scared.... I think because if Jeff would have told on Floyd then Floyd would have done something to Jeff." Hedley further said: "[H]e started acting scared.... He told me he had to wait till Floyd left...." (When Hedley asked Damren, "What are you planningwhat are you planning on doing to Jeff?" he responded, "I've just got to get rid of him." )
[16] Our decision in Gardner v. State, 480 So.2d 91 (Fla.1985), is inapplicable to these facts. There, we held that the trial court erred in admitting in the penalty phase the testimony of a police officer wherein the officer stated that Tyler, a nontestifying codefendant, told him that Gardner had stabbed the victim. The present case is fundamentally different: 1) The statements here were excited utterances; 2) the declarant here, Chittam, was not a codefendant (he was never charged with a crime); 3) the declarant here was unavailable not because he had invoked his constitutional rights in the face of criminal charges, but because he had been killed; 4) the testifying witness here was a friend of the declarant's, not a police officer; and 5) the out-of-court statements here were made to a friend in a noncustodial setting, not to the police. In short, none of the reliability concerns underlying Gardner are implicated.
[17] Issues 6, 7, and 9 are without merit.
[18] Any error in issue 8 is harmless.