838 So.2d 512 (2003)
Floyd DAMREN, Appellant,
v.
STATE of Florida, Appellee.
Floyd Damren, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC01-1469, SC01-2808.
Supreme Court of Florida.
January 23, 2003.
*514 Jefferson W. Morrow, Jacksonville, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Curtis M. French, Senior Assistant Attorney General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Floyd Damren, an inmate under sentence of death, appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the denial of Damren's postconviction motion and deny the petition for habeas corpus.

FACTS
Floyd Damren was convicted of first-degree murder, armed burglary, and aggravated assault and sentenced to death based on the following facts:
Floyd W. Damren entered the grounds of R.G.C. Mineral Sands, stole equipment, and told a friend: "There [is] ... some more good stuff down there I'd like to get." Several weeks later, after drinking beer with friends, Damren returned at night, May 1, 1994, with an accomplice, Jeff Chittam, and the two burglarized the electrical shop in the maintenance barn. As Chittam was taking a break, he was confronted by the duty electrician, Don Miller. Damren then snuck up behind Miller and struck him with a steel pipe. As Miller fell to the ground, he pleaded for mercy, saying he was going on vacation the next day and was taking his grandson fishing. Chittam too begged Damren not to hurt Miller any more. Damren paced the floor for a while, then proceeded to bludgeon Miller. As Damren was dragging Miller's body across the floor, the shift supervisor, Michael Knight, entered the building and hollered at Damren. Damren turned, looked Knight "dead in the eye," and came at him with the pipe. Knight ran from the building, yelling. Damren fled. Miller died later that night.
Knight immediately identified Damren to police (Damren had lived in Knight's neighborhood since childhood) and Damren was arrested and charged with first-degree murder, armed burglary, and aggravated assault. At trial, the medical examiner testified that the victim, Miller, had been struck a minimum of seven times on the head and four on the body. Four of the head wounds would have caused unconsciousness and death, including one "chopping wound that basically goes from the base of the nose all the way across the head," breaking open the skull and exposing the lacerated surface of the brain underneath. Miller had numerous defensive wounds.
Evidence against Damren included the following: Knight testified as to what he saw when he entered the maintenance building that night; several witnesses testified that Damren had made incriminating statements to them following *515 the murder; and blood stains on Damren's pants matched Miller's blood. Chittam was not charged, nor did he testifyhe became the victim of a separate homicide, in which Damren was charged.
Damren relied principally on an intoxication defense, arguing that he had drunk several beers that day. He was convicted as charged. During the penalty phase, numerous relatives and friends testified on Damren's behalf. The jury voted unanimously for death and the judge imposed a sentence of death based on four aggravating circumstances, [Note 1] no statutory mitigating circumstances, and four nonstatutory mitigating circumstances. [Note 2]
[Note 1:] The court found the following: Damren had previously been convicted of a violent felony; the murder took place during commission of a burglary; the murder was especially heinous, atrocious, or cruel [HAC]; and the murder was committed in a cold, calculated, and premeditated manner [CCP].
[Note 2:] The court gave "little" or "some" weight to the following: The underlying burglary did not involve a preconceived plan to use weapons or violence; Damren did not act alone; Damren had an alcoholic father and had an alcohol problem himself; [and] Damren had been a good prisoner.
Damren v. State, 696 So.2d 709, 710-711 (Fla.1997). Damren appealed, raising nine issues.[1] We affirmed. Id.
Damren subsequently filed a motion to vacate the judgment and sentence pursuant to rule 3.851, raising twenty-six claims.[2] The circuit court held an evidentiary *516 hearing on April 10, 2001, and denied relief. Damren appeals, raising three issues. He also has filed a petition for a writ of habeas corpus.

3.851 APPEAL

A. Ineffective Assistance of Counsel
In Damren's first claim, he asserts that his trial counsel was ineffective during the penalty phase of the trial. Damren contends that counsel provided ineffective assistance because counsel failed to present evidence of a nonstatutory mitigator, potential brain damage. He alleges that his attorney failed to give Damren's medical records to Dr. Ernest Miller (an expert who testified on Damren's behalf during the original trial) and that if he had done so, Dr. Miller would have known that Damren had suffered a seizure which likely produced brain damage. To support this claim, postconviction counsel presented the opinion of Dr. Miller, who testified that he was not provided with Damren's medical records during the trial but was provided with them during the postconviction proceedings. Those records revealed the fact that several years before the crime, Damren suffered from a cocaine-related seizure. Based on this fact, Dr. Miller opined that it was 90-95% probable that Damren suffered mild "neuronal damage" or brain damage during the seizure. Dr. Miller, however, was not able to discern the scope of this injury since he never tested Damren.[3]
Pursuant to Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in order to establish a claim of ineffective assistance of counsel, a defendant must prove two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Valle v. State, 778 So.2d 960, 965 (Fla. 2001) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052). As this Court has held, "The standard of review for a trial court's ruling on an ineffectiveness claim also is *517 two-pronged: The appellate court must defer to the trial court's findings on factual issues but must review the court's ultimate conclusions on the deficiency and prejudice prongs de novo." Bruno v. State, 807 So.2d 55, 61-62 (Fla.2001).
Damren's trial counsel testified during the postconviction proceedings. Although defense counsel possessed Damren's medical records at the time of trial, he made a strategic decision not to provide these records to Dr. Miller. Specifically, after counsel unsuccessfully attempted to discover mental health mitigation from two other experts, defense counsel chose to change tactics. Since there was evidence that Damren had been drinking on the night of the crime, he focused on presenting a voluntary intoxication defense and retained Dr. Miller in order to ask him limited, hypothetical questions relating to alcohol and its potential effect on a person's judgment. Hence, Dr. Miller was not given the records. Moreover, counsel decided that it was best if Dr. Miller did not personally interview Damren since Damren had a clear memory of the events on the night of the crimea fact which would have compromised the voluntary intoxication defense.
We agree with the trial court's conclusion that Damren has failed to demonstrate that his trial counsel was deficient. As noted above, counsel possessed the medical records in question and had a valid reason for not providing them to Dr. Miller. Counsel also contacted two other experts in an attempt to present mental health mitigation but chose to not present their testimony because it would be more damaging than helpful. The fact that Damren has now found an expert to testify to potential brain damage does not equate to a finding that the initial investigation was insufficient. See Asay v. State, 769 So.2d 974, 986 (Fla.2000) ("[T]rial counsel conducted a reasonable investigation into mental health mitigation evidence, which is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert.").
We also agree with the trial court's conclusion that no prejudice was established. At the most, this proffered evidence would constitute a nonstatutory mitigator which would have minimal impact, if any. First, the evidence regarding brain damage was speculative. No tests confirmed that Damren had indeed suffered any neuronal injury, but it was merely assumed that based on his seizure, Damren must have suffered brain damage. Second, in preparing for the trial proceedings, Dr. Sherry Risch tested Damren for organic brain damage. Her testing revealed that Damren had a high average intelligence and was not deficient in problem solving skills, cognitive flexibility, impulse control, or visual and motor integration. Brain damage, if any, was minimal at best and did not significantly affect these areas. When viewing this minimal amount of mitigation in light of the strong aggravating factors which were present (CCP, HAC, prior violent felonies, and that the crime was committed during the course of a burglary), the alleged deficiency did not affect the fairness and reliability of the proceeding. We find no error.
Next Damren contends that his counsel was deficient for failing to present evidence that Damren was addicted to cocaine. Trial counsel, however, clearly considered this potential mitigator and made the strategic decision not to present it. Specifically, when postconviction counsel asked trial counsel why he did not introduce any of Damren's cocaine history, counsel replied:

*518 A number of reasons. Number one, it wasn'tno cocaine history was related to the offense that I represented him on. The murder here in Clay County, from everything I could determine, was not committed while Floyd was under the influence of cocaine.
Number two, it was our feeling that the best way to try to get a life recommendation for Floyd was to have the jury think that he was just a drunk who was
Q: Rather than a drug addict?
A: Rather than a drug addict. And although cocaine addiction and cocaine use is considered to be mitigating rather than aggravating, I think I'm not alone as a defense attorney in thinking that thatthe fact of cocaine use or cocaine addiction sometimes is considered as aggravation by a jury in spite of what lawyers say.
As this Court has held, "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). We agree with the trial court's conclusion that counsel was not deficient in this regard. We find no error.
In his next allegation relating to ineffectiveness, Damren contends that counsel was ineffective in failing to request individual voir dire. Postconviction counsel alleges as follows:
Counsel also failed to request individual sequestered voir dire, a commonly used device for insulating prospective jurors from the contaminating effect of other jurors' prejudicial comments. Had counsel moved for such examination, the motion should have been granted. Here, there was far more than the "significant possibility of prejudice" which mandates individual voir dire. As a result of the use of en masse voir dire, every venire person became exposed to the collective pretrial knowledge and opinions of the entire venire.
An excusal for cause should be granted if there is any reasonable doubt about a juror's impartiality.
Counsel, however, fails to explain which prejudicial comments and opinions contaminated the panel. Nor does he cite to any portion of the record to support this contention. We find this claim facially insufficient. See Sweet v. State, 810 So.2d 854, 869 (Fla.2002) (holding that the conclusory allegations that counsel "failed to conduct an adequate voir dire; to object to the introduction of inflammatory and improper evidence; and failed to present adequate argument to the jury" were facially insufficient).
As his final allegation of ineffectiveness, Damren contends that trial counsel was ineffective in failing to call Arlene DeLong as a penalty phase character witness. DeLong was a close friend of Damren's, and during their relationship together, she became pregnant with Damren's child. When she told Damren about the pregnancy, he was abusing cocaine heavily and told her that he could not handle that type of responsibility but would send her money for an abortion. DeLong suffered medical complications from the abortion and soon after had a nervous breakdown.
Although DeLong could have testified that Damren was helpful to her and her disabled son, trial counsel had already presented numerous other witnesses (Doloris Hill, Roger Prout, John Shagg, and Nancy Waldrup) who testified that Damren was good to his friends. Moreover, in light of DeLong's testimony regarding Damren's cocaine abuse and the fact that he abandoned her after she became pregnant with *519 his child, DeLong's testimony would have been more damaging than helpful. Hence we agree with the trial court's conclusion that counsel was not ineffective in this regard. We find no error.

B. Public Records
Damren asserts that the trial court erred in denying his request for certain public records from the State Attorney's office. According to Damren, the circuit court failed to review these records for exculpatory information under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We disagree.
As this Court has held, "where doubt existed as to whether the State must disclose a particular document, the proper procedure is to have a trial judge conduct an in-camera review of the documents." Rose v. State, 774 So.2d 629, 636 (Fla. 2000). This Court applies an abuse of discretion standard when reviewing a trial court's determination on a public records request. Moore v. State, 820 So.2d 199, 204 (Fla.2002).
The record reveals that the State provided the requested records to the trial court for an in-camera review and the postconviction judge granted the public records request in part and denied it in part. During a hearing, the circuit court carefully reviewed each folder of materials which was submitted, explained what information was contained in each folder and whether it included exculpatory information,[4] and indicated the files to which defense counsel was entitled. We find that the trial court did not abuse its discretion in denying in part Damren's request and hence deny relief. We find no error.

HABEAS CORPUS PETITION
In Damren's first habeas claim, he contends that HAC was not established because the victim's consciousness during the fatal beating was proven only through "inadmissible hearsay evidence" relating to statements made by Chittam. Damren raised a similar claim on direct appeal, which this Court rejected:
Damren claims that the court erred in allowing Wendy Hedley, Tessa Mosley, and Joanne Waldrup to testify in the penalty phase as to what Chittam said about the murder when he returned to Hedley's trailer immediately following the killing. We disagree.
The State argued the following in its proffer of Chittam's statements to the trial court: 1) Hearsay is admissible in the penalty phase; 2) Damren was accorded a fair opportunity to rebut Chittam's statements because Hedley, Mosley, and Waldrup were available for cross-examination; 3) Chittam's statements were corroborated by other witnesses who also were available for cross-examination; and 4) Chittam himself was unavailable for cross-examination only because Damren, in order to silence him, had beaten him to death with a hatchet shortly after he made the statements. The State also argued that the statements were admissible in any event as excited utterances.
Our review of the record shows no abuse of discretion in admitting Chittam's statements. See Blanco v. State, 452 So.2d 520, 523 (Fla.1984). We addressed a similar deceased-declarant scenario in Spencer v. State, 645 So.2d 377 (Fla.1994), wherein the out-of-court *520 statements of the murder victim (describing a prior attack and threat by the defendant) were admitted in the penalty phase via the in-court testimony of a police officer. We found it sufficient under section 921.141(1), Florida Statutes (Supp.1992), that "Spencer was ... given an opportunity to cross-examine the officer." Id. at 383-84. Damren was accorded the same opportunity. See also Waterhouse v. State, 596 So.2d 1008 (Fla.1992).
Further, Chittam's statements fall within the excited utterance exception to the hearsay rule. The statements were made shortly after the murder of Miller; Chittam was in a highly agitated state over the burglary gone awry when he made the statements; and he was in dire fear for his own life because of the killing he had just witnessed. As noted above, Chittam was killed within hours of making the statements. We find no error.
Damren, 696 So.2d at 713-14 (footnotes omitted). Appellate counsel also contended that the murder was not heinous, atrocious, or cruelanother claim which this Court rejected. See id. at 714 n. 17.
Damren now attempts to re-argue these two issues in his habeas petition. As this Court has repeatedly stated, "it is improper to argue in a habeas petition a variant to a claim previously decided." Porter v. Crosby, 840 So.2d 981, 984 (Fla. 2003). See also Thompson v. State, 759 So.2d 650, 657 n. 6 (Fla.2000) (declining the petitioner's "invitation to utilize the writ of habeas as a vehicle for the reargument of issues which have been raised and ruled on by this Court"). Accordingly, as these issues, or variants of them, were already raised and rejected on direct appeal, we deny this ground.
Damren next claims that the HAC aggravating factor is unconstitutionally vague and that the jury was not sufficiently instructed on this factor. In support, he relies on Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), wherein the United States Supreme Court found Florida's jury instruction regarding the aggravating factor of "especially wicked, evil, atrocious, or cruel" was unconstitutionally vague. In the instant case, however, the jury was not given the same instructions. Specifically, the trial judge instructed the jury as follows:
The crime for which the defendant is to be sentenced was especially heinous, atrocious, or cruel. "Heinous" means extremely wicked or shockingly evil. "Atrocious" means outrageously wicked and file [sic]. "Cruel" means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. The kind of crime intended to be included as heinous, atrocious, or cruel is one accompanied by additional acts that show that the crime was conscienceless or pitiless and was unnecessarily torturous to the victim.
In Hall v. State, 614 So.2d 473, 478 (Fla.1993), this Court held that the same jury instruction was not unconstitutionally vague. Accordingly, we deny this claim since appellate counsel cannot be deemed ineffective for failing to raise a claim which this Court already rejected. Sweet v. Moore, 822 So.2d 1269, 1274 (Fla. 2002) ("[A]ppellate counsel cannot be ineffective for failing to raise a meritless claim.").
In Damren's final habeas claim, he asserts that his counsel was ineffective for failing to object when the trial court informed the jury that its role was merely advisory. Since trial counsel failed to preserve this claim for appeal and it does not *521 constitute fundamental error, we deny relief. See Combs v. State, 525 So.2d 853, 857 (Fla.1988); Jackson v. State, 522 So.2d 802, 809 (Fla.1988).[5]

CONCLUSION
For the above reasons, we affirm the lower court's denial of Damren's 3.851 motion for postconviction relief and deny the petition for habeas corpus.[6]
It is so ordered.
ANSTEAD, C.J., WELLS, PARIENTE, LEWIS, QUINCE and CANTERO, JJ., and SHAW, Senior Justice, concur.
NOTES
[1] Damren claimed that the trial court erred by (1) admitting similar-fact evidence, (2) refusing to give the standard jury instruction on the rule of evidence derived from Williams v. State, 110 So.2d 654 (Fla.1959), (3) overruling Damren's objection to the prosecutor's remarks about the intoxication defense, (4) admitting victim-impact evidence, (5) admitting Chittam's hearsay statements, (6) finding that the murder was HAC, (7) finding that the murder was CCP, (8) failing to find certain mitigation, and (9) imposing a disproportionate death sentence.
[2] Specifically, postconviction counsel raised the following claims: (1) requiring Damren to file a motion for postconviction relief within one year after the affirmance of his convictions violates his constitutional rights; (2) Damren is innocent of first-degree murder; (3) newly discovered evidence establishes that Damren's capital conviction and sentence are unreliable; (4) Damren is innocent of the death penalty; (5) Damren was denied his constitutional rights when the prosecutor suggested to the jury that the law required the jury to recommend a sentence of death; (6) the rule prohibiting Damren's counsel from interviewing jurors is unconstitutional; (7) defense counsel was ineffective during the penalty phase by failing to call certain witnesses; (8) Florida's death penalty statute is unconstitutional on its face and as applied in this case; (9) Damren's constitutional rights were violated because no reliable transcript of the trial exists; (10) Damren was denied a fair trial because the trial court permitted the State to introduce gruesome and shocking photographs; (11) defense counsel was ineffective during voir dire proceedings; (12) the trial court instructed the jury erroneously regarding the standard to apply to expert witnesses; (13) the trial court failed to find and weigh mitigating evidence which was clearly established in the record; (14) introducing nonstatutory aggravators resulted in an arbitrary imposition of the death penalty; (15) defense counsel failed to object to the prosecutor's statement regarding the believability of the star State witness; (16) the sentencing jury was misled by erroneous instructions and arguments which diminished its sense of responsibility; (17) Damren was denied effective assistance of counsel at both the guilt and penalty phases; (18) defense counsel failed to adequately employ the services of available mental health experts; (19) application of the aggravating circumstances violated Damren's constitutional rights; (20) improper consideration of character and victim impact statements violated Damren's constitutional rights; (21) during the penalty phase, the burden of proof was shifted; (22) the prosecutor's closing arguments during the guilt and penalty phases denied Damren a reliable trial; (23) the jury was incorrectly informed as to its role during the penalty phase; (24) the trial court erred in permitting the State to argue a lack of remorse; (25) the State withheld exculpatory evidence and presented misleading evidence; and (26) based on cumulative errors, Damren is entitled to a new trial.
[3] In fact, Dr. Miller conceded that it would be extremely difficult to determine whether this potential injury had any effect on Damren:

I will tell you it's very difficult with even neuropsychological testing to identify subtle impairments which may be subtle, but meaningful. There is a great deal of redundancy built into the brain. We have ten thousand million neurons. We may lose ten thousand of them. In all appearances through most testing, testing which measures cognitive functions, show relatively good functions. But that's only meaningful if we have a base line by which to compare it, and also a specific benchmark to compare for cognitive impairment with respect to what skill in a person of some of abstractive relatedness or whatever it is. It's a very difficult area to be concrete about, without having quite specifics and certainly without having a brain biopsy which is not realistic.
[4] For example, when discussing the jury selection lists, the judge declared, "There is absolutely no exculpatory-type [evidence]." Again, when reviewing the State's trial order notes, the judge stated, "And it would appear to me that it is attorney work product, contains no exculpatory information that I can glean."
[5] To the extent that counsel is attempting to raise the ineffectiveness of trial counsel, we reject this claim because it is not the proper subject of a habeas petition. See Hall v. Moore, 792 So.2d 447, 449-50 (Fla.2001) ("We reject this issue because such a claim concerning the failure to present evidence at trial is a claim concerning the effectiveness of trial counsel which is properly raised in a rule 3.850 motion and is not a claim concerning the effectiveness of appellate counsel, which is the sole subject of this habeas petition.").
[6] We reject any other issues or subissues raised by Damren in his rule 3.851 proceeding and in his habeas petition.