885 So.2d 968 (2004)
Dario THOMAS, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-1380.
District Court of Appeal of Florida, Fourth District.
November 3, 2004.
*969 Howard Sohn of the Law Offices of Howard Sohn, Miami, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Daniel P. Hyndman, Assistant Attorney General, West Palm Beach, for appellee.
HAZOURI, J.
Dario Thomas appeals his convictions for two counts of robbery with a firearm and his sentence to thirty years in state prison. He raises four points on appeal: (1) that the trial court erred as a matter of law in allowing the state to use a peremptory challenge to a black juror without a genuine race-neutral reason; (2) that the trial court erred in allowing the admission and introduction of six unrelated and uncharged Dade County armed robberies on the basis that these six unrelated robberies were inextricably intertwined with the crimes for which he was charged; (3) that the trial court erred in denying his motion to discharge his privately retained attorney and denying him a reasonable opportunity and sufficient time to retain new counsel; and (4) that the thirty-year sentence imposed by the trial court was a vindictive sentence.
We agree that the trial court erred on points one and two, and, therefore, reverse and remand for a new trial. We find it unnecessary to address points three and four.

Material Facts
Christie Martineau and Jorge Malta were parked in her car in the driveway of Malta's apartment complex at 11:45 P.M. on February 11, 2001, in the City of Miramar. As Malta opened the passenger door to get out, a black male pushed him back into the car at gunpoint. There was also a second black male on the passenger side. A third black male opened the driver's door where Martineau was seated and demanded her money. Martineau described *970 him as being about 5' 9'' tall, medium build, wearing a grey skull cap on his head, having dark brown eyes, with the whites around his eyes yellow in color. Martineau was unable to identify the other two suspects. She gave the robbers her purse, necklace, and bracelet.
Malta, the passenger, described the person who approached his side of the car as wearing a red or red striped sweater and skull cap. Malta described the second suspect on the passenger side as short and wearing dreadlocks or short braids. Both had guns. Malta described the suspect on the driver's side who was pointing a gun at Martineau as being tall, heavy set, approximately 220 pounds and wearing a black leather jacket. Malta testified that the first subject patted him down and told him to give him his money and jewelry. Malta complied and handed him his wallet. The second suspect entered the back seat of the car looking for valuables while the suspect on the driver's side was taking and removing Martineau's jewelry at gunpoint.
During the course of the robbery law enforcement from Miramar arrived and interrupted the robbery. Both subjects ran from the passenger side of the car to another car parked directly behind Martineau's car. The third subject who was by the driver's door pointed his gun at Malta and told him to get back in the car and act like nothing was going on. Then that suspect also ran back to the other car and fled.
Officer Esponda chased the suspects' car and was forced to abandon the chase when his car became stuck in the mud. Other police officers from Dade County continued the pursuit and followed the vehicle into northern Dade where the vehicle stopped. The three subjects bailed out and ran. Officer Escarra testified that he saw the driver's face as he ran and that the driver was wearing a red shirt. He identified the driver as the defendant, Dario Thomas. Another officer also described the driver as wearing a red shirt and identified Thomas.
Later that evening, Malta and Martineau were driven by Miramar police to a convenience store in Dade for a show-up identification where three handcuffed black males were standing together. Malta identified Jabar Fernander and Latarus Anthony as being the two men on the passenger side of the car but did not identify Thomas. Martineau identified Thomas as the driver of the car and could not identify the other two. Prior to the show-up, Martineau was told by police that the chase had ended and the police had the suspects in custody.
Neither Malta nor Martineau made an in-court identification of Dario Thomas.
Both Jabar Fernander and Latarus Anthony were called as state's witnesses and each acknowledged he had six felony convictions. They testified that they had a plea agreement and were getting reduced charges and sentences for their participation in the robberies. Fernander testified that he has six felony convictions, all occurring on February 11, 2001 (the same night as Thomas's charged crime). On this night he was with Prosper Dorville, Latarus Anthony, and Dario Thomas. He met with Thomas at about 7:00 P.M. at Prosper's home. They were all "drinking and smoking" and went out and committed six robberies in Dade County armed with revolvers. They used two cars which they stole. During the evening they "dumped" one of the vehicles and then all used the same car.
He testified Thomas participated in the robberies over a period of three hours and Thomas was the one who drove the car into Broward County. They pulled up to the victim (Martineau's) car and demanded money from the man in the car (Malta). The man said he didn't have any money *971 and he gave Fernander his wallet. Fernander said that Anthony was searching the back seat of the car and he didn't see what Thomas and Dorville were doing. When the police arrived Fernander and Anthony ran back to their car and Thomas and Dorville were coming back towards the car. As they drove off Thomas was driving the car. The police chased them and ran them off the road. They got close to 92nd Street near Dorville's house, stopped the car and jumped out. Fernander was caught at the end of an alley.
Latarus Anthony also testified for the state. His six felony convictions were armed robberies from Dade County which occurred on February 11, 2001. He testified that he, Fernander, and Thomas stole a car. Thomas was driving them around committing robberies. They drove into Broward County and pulled up behind the victim's (Martineau's) car. Anthony and Fernander went to the passenger side and Dorville went to the driver's side. Thomas walked up to the car with his gun out and told them to hurry and get the money. Someone yelled that the police were coming and they ran back to their car.

Peremptory Challenge
During jury selection, the trial court conducted the initial questioning to obtain general background information on prospective jurors. In the course of the initial questioning, it was determined that juror Javier Gasana was a married black male who had come to the United States from Africa approximately fifteen years earlier. He had been living in Pembroke Pines for seven years and was employed as a college professor at Florida International University in Miami. Gasana stated that his wife was a graduate student, that they had four children and his oldest son worked for Pizza U.S.A. Gasana advised that his hobbies were tennis and meditation and that he had never served on a jury.
After the trial court had completed the initial questioning of the prospective jurors the state and the defense were given an opportunity to conduct voir dire. The prosecution chose not to ask Gasana any additional questions but at the conclusion of voir dire, the prosecutor exercised a peremptory challenge on Gasana. The defense objected on the grounds that Gasana was black and a member of a distinct racial class and asked for a race-neutral reason for the strike. The prosecutor stated that Gasana had simply sat silent throughout the jury selection process. The defense counsel challenged the validity and genuineness of the prosecutor's reason, stating, "I don't think that is a race neutral reason at all. I mean if you asked him questions, he answered them. I asked him a question, he answered my question. It's not his fault that nobody asked him anything." The trial court then asked the prosecutor two additional times to state his race-neutral reason for the strike, and the prosecutor stated "it was simply his silence throughout the process." The trial court then ruled that this was a race-neutral reason and stated:
Court: Okay. The problem, Mr. Cotrone [Defense counsel], is that I don't feel that the personal feelings of the State Attorney as to using one of his peremptories on Mr. Gasana because of his demeanor or his lack of participation or lack of response based on what the particular information of Mr. Gasana, based on the Court's observations of Mr. Gasana's demeanor and based on the fact that it has not been a systematic striking of minorities in the panel by Mr. Patanzo [Prosecutor], I do not find it to be a pretext and find it to be a race neutral reason.
Thomas argues that the trial court erred as a matter of law in allowing the state's use of a peremptory challenge to excuse Gasana without conducting a "genuineness" *972 inquiry pursuant to Melbourne v. State, 679 So.2d 759 (Fla.1996). In Melbourne, the defendant was on trial for DUI manslaughter. During voir dire the defense objected to the state's use of a peremptory challenge to strike a black venireperson, Mr. Wells, who had indicated that his wife had died of alcoholism. After the defense objected to the use of the peremptory challenge the state pointed out that the defense had stricken two black jurors whom the state had been willing to accept. The trial court found the reason to be nonracially motivated and allowed the strike. On appeal, Melbourne argued that the explanation offered by the state was insufficient. The Florida Supreme Court explained that:
A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but rather its genuineness.
Id. at 764 (footnotes omitted).
Thomas argues that the trial court asked the prosecutor to state a race-neutral reason, but then failed to conduct the required genuineness analysis. The state responds that the trial court did properly consider the genuineness of the state's reasons for the strike. The state asserts that the transcript shows that although the judge did not specifically use the word "genuine," she nevertheless found the strike to be so when she stated that she did not believe it was a pretext. The trial court stated that she agreed with the prosecutor's observations about Gasana's demeanor and noted that there had been no systematic striking of jurors for racial reasons.
In support of its position, the state relies on Dorsey v. State, 868 So.2d 1192 (Fla.2003). There, the question was whether a party's observation of a juror's nonverbal behavior could constitute a genuine, race-neutral reason for a peremptory challenge when the purported behavior was challenged by the opposing party and was not observed by the trial court, nor otherwise supported by the record. In Dorsey, the state exercised a peremptory challenge on juror George, a black woman, on grounds that she "appeared disinterested" throughout. The defense counsel objected and asked for a race-neutral reason and stated that George had appeared very attentive to him during the process. The defense counsel commented that when he had asked who was happy to be there on jury duty that she was the only person to state affirmatively that she was happy to be there. The trial court made a finding that the state's reason was not pretextual. The trial judge stated that he had not noticed that George was disinterested but asked the prosecutor "are you telling me as Officer of the Court that that [lack of interest] was your observation of this juror and that is why you wish to have her excused?" To this, the prosecutor said, "Exactly." The court then allowed the peremptory strike. The Florida Supreme Court reversed and ruled that the state's strike of the prospective juror, because she appeared "disinterested," *973 was not supported by the record, nor confirmed by the trial judge.
The supreme court referred to an earlier decision, Wright v. State, 586 So.2d 1024 (Fla.1991), where it had held that bare looks and gestures cannot be accepted as race-neutral reasons for peremptory challenges unless observed by the trial court. In Dorsey, the court went on to explain that:
The principle that emerges from Wright and Melbourne, in tandem, is that the proponent of a strike based on nonverbal behavior may satisfy its burden of production of a race-neutral reason during the second step of the process described in Melbourne only if the behavior is observed by the trial court or otherwise has record support. Once this burden of production is satisfied, the proponent is entitled to the presumption that the reason is genuine.
Dorsey v. State, 868 So.2d at 1199.
Relying on Dorsey, the state now asserts that in the instant case the trial court concurred with the state's observation that Gasana was not involved in the jury selection process. The judge stated that "based on the court's observation of Gasana's demeanor[1] and based on the fact that it has not been a systematic striking of minorities in the panel by Mr. Patanzo, I do not find it to be a pretext and find it to be a race neutral reason." We agree that Dorsey controls but disagree that it supports the state's position. The nonverbal behavior cited by the state as a race-neutral reason for peremptorily challenging Gasana has no record support and is not confirmed by observations of the trial court.
Our review of the transcript of voir dire reflects that initially, the trial judge asked potential jurors to answer a list of questions. Gasana answered them as indicated above. The only other time Gasana spoke was when another member of the venire stated that he would want to hear the defendant testify and give his side of the story. The defense then asked if anyone agreed with that idea. Gasana raised his hand (along with several other jurors). The defense attorney then discussed the burden of proof with them but did not specifically question Gasana. The record further reflects that the state thereafter did not ask any specific questions of Gasana, nor did the state ask any general questions of the panel that would require Gasana to respond.
In responding to the trial court's request for a race-neutral reason for striking Gasana, the state did not mention Gasana's demeanor. The prosecutor did not assert that Gasana appeared "disinterested" or that Gasana had by body language or gestures indicated hostility towards the state. The trial judge likewise made no such observation. The mere fact that the trial judge stated that she observed Gasana's demeanor with no further explanation does not meet the test required by Dorsey. Observation of silence in the face of no inquiry as confirmation of nonverbal behavior is a non sequitur. Without more, it cannot be a genuine race-neutral basis for excluding Gasana from the jury. We are therefore compelled to reverse and remand for a new trial.

Inextricably Intertwined Crime Evidence
During the presentation of its case-in-chief and without any prior notice to defense counsel, the prosecution sought to admit and introduce evidence of six separate, unrelated and uncharged armed robberies allegedly committed by Dario Thomas, Jabar Fernander, Latarus Anthony *974 and Prosper Dorville in Miami, Dade County, Florida, in the three hours preceding the commission of the Malta and Martineau robbery in Miramar, Florida.
The prosecutor specifically advised the trial court that these robberies constituted "inextricably intertwined evidence" under State v. Cohens, 701 So.2d 362 (Fla. 2d DCA 1997), and were introduced for the sole purpose of establishing and proving Thomas's motive and intent in committing the charged robbery in Broward County.
The trial court, over defense counsel's objection, ruled that this evidence was "inextricably intertwined" with the underlying offense and accordingly the jury heard from the two former Co-Defendants, Jabar Fernander and Latarus Anthony, that Fernander, Anthony, Prosper Dorville and Thomas, after "partying, drinking and smoking," committed a series of six armed robberies in Dade County in the three hours preceding the Malta and Martineau robbery in Miramar.
Citing Cohens, the state argues that the trial court did not abuse its discretion in allowing in the evidence of the other crimes because the evidence was admissible under section 90.402, Florida Statutes (2003), as relevant evidence in order to show that Thomas intended to rob the victims, Malta and Martineau.
In Cohens a codefendant, Butler, and Cohens were charged with the shooting death of a clerk at a gas station. The state sought to introduce evidence that Cohens and Butler attempted to rob the Flowers Bakery half an hour earlier. The state argued the evidence was either Williams[2] rule evidence under section 90.404(2), Florida Statutes (2003), or was inextricably intertwined. The trial court precluded the introduction of the evidence and the state appealed. The second district reversed the trial court.
Cohens had made a statement to police and admitted his involvement in the Flowers attempted robbery but claimed that he had declined to participate when Butler had said he was going to attempt another robbery. A third man had testified that Cohens told him that Cohens dropped Butler off at the gas station and had said he was not going to take part in the robbery. Cohens had allegedly stated that he had then gone to his cousin's house and parked his car and walked back to the gas station and observed the robbery and saw Butler shooting the clerk. Cohens purportedly ran back to his car and "guessed" that Butler followed him. A group of schoolchildren were outside the gas station and one of the children testified that he recognized Cohens and had seen him and another man inside the store and both had guns. The second district ruled that the evidence of the earlier robbery attempt was not Williams rule or similar fact evidence; however, the court ruled that it was inextricably intertwined evidence. The court discussed Damren v. State, 696 So.2d 709 (Fla.1997), to support its decision.
In Damren, the defendant and an accomplice had gone to mining grounds and burglarized a maintenance barn. During the course of the burglary they had been interrupted by a technician whom Damren bludgeoned to death. At Damren's first degree murder trial the court allowed in evidence that several weeks earlier Damren had gone to the mine and stolen a generator. The supreme court held that the evidence was not similar fact evidence, but was nevertheless admissible because it was "integrally connected" to the crimes at issue. The defendant claimed to have been too drunk to form the intent to participate in the robbery; however, the court ruled that the earlier crime had been admissible because it supported the state's *975 theory that the defendant possessed the specific intent to burglarize the mine.
Applying Damren, the Cohens court noted that Cohens's intent was at issue. The court ruled that because of the integral connection between the attempted robbery at the Flowers Bakery and the shooting at the gas station, the earlier incident could be used to prove that Cohens had the specific intent to commit a robbery at the second location. The court also stated that it established Cohens's motive for being present at the gas station. Because Butler blamed Cohens for the failure of the earlier attempted robbery the men reversed roles in the second station holdup. Thus, the attempted robbery was necessary to explain Cohens's presence at the murder scene and his role. As to motive, the earlier attempted robbery could show that Cohens's presence at the gas station was merely a second attempt to achieve a previously frustrated goal.
We find Cohens inapplicable because introduction of the six unrelated and uncharged armed robberies was not necessary to prove motive or intent for the crimes charged in the instant case and, therefore, not "inextricably intertwined evidence."
In order for these six uncharged crimes to be admissible as inextricably intertwined evidence, they must be admissible under section 90.402.[3] To be admissible under section 90.402, the evidence must be a relevant and inseparable part of the act which is in issue and it must be necessary to admit the evidence to adequately describe the crime charged. See Griffin v. State, 639 So.2d 966, 967 (Fla.1994).
In Griffin the defendant had stolen a car after burglarizing a hotel room in which he found the keys and, while using the stolen vehicle to commit additional crimes, shot and killed a police officer. He argued on appeal that evidence of the burglary of the hotel room in which he obtained the car keys should not have been admitted in the trial in which he was charged with murder, theft of the stolen car, and other crimes. The court held that, although the defendant was not on trial for burglary of the hotel room in which he obtained the keys to steal the car, the evidence was admissible. The court stated: "The manner in which the car keys were taken was inextricably intertwined with the theft of the automobile, one of the charges before the jury. The testimony was necessary to establish the entire context out of which the crime arose." Id. at 969. See also Shively v. State, 752 So.2d 84, 85 (Fla. 5th DCA 2000) (evidence necessary to describe the manner in which a criminal offense took place or how it came to light is generally admissible as inextricably intertwined with the underlying offense because, without this evidence, the state would be unreasonably hampered in the presentation of its case).
The admission of these six Dade County armed robberies was not necessary to describe the underlying offense and without this evidence the State would not have been unreasonably hampered in the presentation of its case. The prosecution was clearly capable of presenting its case in a manner so as not to encompass or even address the Dade County armed robberies, but by simply focusing on the crime charged and Thomas's alleged involvement and participation.
Finally, the state argues that even if the admission of the six Dade County crimes was error, it was harmless in this case. For support of its assertion of *976 harmless error, the state notes that both Malta and Martineau testified on the details of the instant robbery; the un-rebutted testimony of co-defendants Fernander and Anthony established Thomas's participation in the instant robbery; the testimony of law enforcement officers involved in the pursuit showed that Thomas ran from the same car which sped away from the scene of the Broward County robbery. We disagree that this was harmless error.
Our court's decision in Griner v. State, 662 So.2d 758 (Fla. 4th DCA 1995), supports the exclusion of the six Dade County crimes and requires a reversal and new trial. In Griner, two robberies were committed within a distance of approximately two blocks and occurred within a period of approximately twenty-two minutes. After the evidence was admitted at trial as Williams rule evidence, the state on appeal recognized that the evidence did not constitute similar fact evidence and argued to this Court that it was properly admissible as "inextricably intertwined" and/or "inseparable crime" evidence under Griffin v. State, supra.
In rejecting the state's contention on appeal and finding that the admission of this evidence could not be excused or condoned as harmless error, we held:
In the present case the facts of the first event were not "inextricably intertwined" with, or "necessary to adequately describe" the second event. The most we can say about the relationship between these two events is that one occurred very soon after the other, which is not sufficient to make the evidence regarding the first incident admissible under Griffin, particularly when we weigh the danger of unfair prejudice to defendant against the relevancy of the evidence (citations omitted). Nor can we say that the admission of this evidence was harmless beyond a reasonable doubt under State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Griner, 662 So.2d at 759.
Likewise, the admission of six unrelated robberies in Dade County three hours prior to the crime at issue here can hardly be considered harmless beyond a reasonable doubt.
REVERSED AND REMANDED FOR A NEW TRIAL.
FARMER, C.J., and STEVENSON, J., concur.
NOTES
[1] The trial court did not delineate what she meant by "demeanor" but equated it with Gasana's "lack of participation or lack of response."
[2] Williams v. State, 110 So.2d 654 (Fla.1959).
[3] Section 90.402 states that "[a]ll relevant evidence is admissible, except as provided by law."