PER CURIAM.
 

 Maurice Lamar Floyd appeals an order of the circuit court that denied his motion to vacate a conviction of first-degree murder and sentence of death filed pursuant to Florida Rule of Criminal Procedure 3.851. Floyd also petitions this Court for a writ of habeas corpus. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), (9), Fla. Const.
 

 I. FACTS AND PROCEDURAL HISTORY
 

 A jury convicted Maurice Lamar Floyd of first-degree murder, armed burglary of a dwelling, and aggravated assault in connection with the death of his mother-in-law, Mary Goss.
 
 See Floyd v. State,
 
 850 So.2d 383, 392 n. 15 (Fla.2002). The jury recommended the death penalty for the murder by a vote of eleven to one.
 
 See id.
 
 at 392. Following that recommendation, the trial court sentenced Floyd to death.
 
 See id.
 
 In the opinion that affirmed the imposition of the death penalty, this Court detailed the facts surrounding the murder:
 

 Mary Goss, the victim in this case, was found dead at approximately 11:30 p.m. on July 13, 1998.... The cause of
 
 *440
 
 Ms. Goss’s death was a single .357 caliber gunshot that entered the left side of her face and proceeded to sever her brain stem, killing her instantaneously. Two days later, on July 15, 1998, police found Floyd, Ms. Goss’s son-in-law, hiding in the attic of a house in the Palatka area. Floyd was subsequently charged with the murder of Ms. Goss.
 

 Testimony adduced at trial indicated that Floyd exhibited very controlling behavior toward his wife, Trelane, [n.2] who was Ms. Goss’s daughter. On July 11, 1998 (extending into the early morning hours of July 12), Trelane had gone with some of her cousins to a supper club to celebrate her birthday. Floyd followed her to the club and spotted her consuming alcohol and dancing.... In the past[,] Floyd had expressed his disapproval of Trelane’s alcohol consumption.
 

 [N.2.] When she testified during trial, Trelane was no longer married to Floyd.
 

 When Trelane returned home around 5 a.m. on the morning of July 12, Floyd informed her that he would not permit her to sleep, and he proceeded to increase the volume on the televisions and the radio in their apartment. He also threatened to kill Trelane or someone she loved as a reprisal for her drinking or if she ever attempted to run or hide from him. Shortly thereafter, Trelane felt a gun being placed beside her head as she was lying in bed. Floyd pulled the trigger three times, but the weapon did not fire....
 

 On July 13, the day Ms. Goss was murdered, Trelane and Floyd had a heated argument on a Palatka street not far from their apartment. Trelane had stopped her car in the street to speak with a friend. Her three-year-old goddaughter was also in the vehicle. Floyd was in his car behind Trelane and he insisted that Trelane take her goddaughter home, calling Trelane a “whore.” Fearful for the safety of both herself and her goddaughter, Trelane decided to seek protection in a sheriffs office. Floyd followed and proceeded to ram his car into the back of Trelane’s vehicle.
 

 ... The tires on both cars squealed as they slid into the parking lot at the sheriffs office. Trelane exited her car and screamed for help. Hearing both the sounds of squealing tires and Tre-lane’s plaintive cries, Deputy Dean Kelly responded from his desk inside the sheriffs office.... The deputy saw Floyd moving rapidly toward them as they spoke, and he held out his hand to prevent Floyd from accosting Trelane. He then advised Floyd that he was going to be placed into investigative custody until it could be determined exactly what had transpired.... Floyd extended his hands in the ah' and backed up, insisting that he had done nothing wrong and that he merely wanted to talk to his wife. After the deputy repeated his order for Floyd to submit to custody, Floyd fled the scene....
 

 After giving a statement to sheriffs office personnel, Trelane called her mother, Ms. Goss.... Ms. Goss informed Trelane that Trelane’s three children were at Ms. Goss’s house. After hearing what had transpired earlier on the street and at the sheriffs office between Trelane and Floyd, Ms. Goss said of Floyd, “I won’t let him get my grandchildren.” Ms. Goss was also aware that the twenty-one-year-old Floyd was then on probation for previous violations of the law.
 

 During the trial, several witnesses described the subsequent events that led to the death of Ms. Goss. J.J. Jones, the
 
 *441
 
 oldest of Trelane’s three children, testified that on July 13, 1998, the day that Ms. Goss was killed, Floyd took him and his two younger siblings to the home of their grandmother, Ms. Goss. J.J. also stated that after he had fallen asleep that evening, Ms. Goss awakened him and instructed him to go to the home of her neighbor, Jeanette Figuero, and to call the police from there.... As J.J. was moving toward Jeanette Figuero’s home, he noticed that Floyd was “squeezing [Ms. Goss] behind the door” at the front of Ms. Goss’s home. Moments later he saw Ms. Goss running outside. J.J. stated that he also observed Floyd standing on Ms. Goss’s front porch and firing a gun three times. J.J.’s two siblings, LaJade Evans and Alex Evans, were directly behind him, as Ms. Goss had awakened them also. J.J. testified that he never saw Floyd leave the victim’s porch, and that the last thing he observed before pounding on Jeanette Figuero’s door for help was his grandmother, Ms. Goss, lying on her back. J.J. eventually led the police to the spot where he thought his grandmother’s body would be. As one of the officers directed a flashlight beam on the ground, the light revealed Ms. Goss’s lifeless body....
 

 LaJade Evans, J.J. Jones’ younger sister, testified that she followed J.J. to Ms. Figuero’s home to seek help. La-Jade saw Floyd on the victim’s porch, shooting a gun at the victim. LaJade said Floyd fired two shots from the porch, and that she heard one more shot fired in the direction of the victim. She added that she saw Floyd running toward the victim’s home but that he did not go inside the home again after having fired his weapon.
 

 [[Image here]]
 

 ... Tashoni Lamb testified that Floyd visited her apartment around midnight on July 13, and that he left after 6 a.m. on July 14.... Lamb stated that Floyd pulled a gun out of the pants he was wearing, placed it on a dresser in the apartment, and said, “I just shot Miss Mary, the grandmother.” She related that Floyd’s reason for shooting Ms. Goss was that “she had threatened to call the police on him.” ... She further testified that Floyd contacted her by phone later on July 14, a day before he was arrested. When the prosecutor asked at trial if anyone had ever asked her to provide an alibi for Floyd, she responded, “Maurice [Floyd] did.” She also testified that during the phone conversation, Floyd asked, “Do you want to see me die?”
 

 Id.
 
 at 387-89, 391 (footnotes omitted).
 

 In sentencing Floyd to death for the murder of Ms. Goss, the trial court found the existence of four statutory aggravating circumstances
 
 [1]
 
 and no statutory mitigating circumstances.
 
 See id.
 
 at 392. The trial judge found four nonstatutory mitigating circumstances and assigned each little weight.
 
 See id.
 
 at 392-93.
 
 [2]
 
 The trial
 
 *442
 
 court also sentenced Floyd to thirty years’ imprisonment for the armed burglary conviction and five years’ imprisonment for the aggravated assault conviction.
 
 See id.
 
 at 393.
 

 Floyd raised thirteen claims on direct appeal.
 
 [3]
 
 This Court struck the conviction for armed burglary and the aggravating circumstance of murder committed during a felony.
 
 See id.
 
 at 402. Since we struck the armed burglary conviction, we also rejected application of the felony-murder theory of guilt to Floyd; however, we affirmed Floyd’s first-degree murder conviction based on the theory of premeditated murder, and we upheld the sentence of death.
 
 See id.
 
 at 387, 402.
 
 [4]
 
 The United States Supreme Court denied certiorari review in 2004.
 
 See Floyd v. Florida,
 
 540 U.S. 1112, 124 S.Ct. 1040, 157 L.Ed.2d 902 (2004).
 

 Floyd filed a postconviction motion pursuant to Florida Rule of Criminal Procedure Rule 3.851. In the motion, he raised three claims for which an evidentiary hearing was sought,
 
 [5]
 
 and two additional claims for which an evidentiary hearing was not required (certain claims contained multiple subparts).
 
 [6]
 
 The circuit court entered an order that scheduled an evidentiary hearing on the three claims for which a hearing was sought. Floyd was then granted leave to amend his motion with one additional claim — that his constitutional rights were
 
 *443
 
 violated when he was shackled in front of the jury.
 

 After an evidentiary hearing, the circuit court entered an order that denied post-conviction relief on January 8, 2007, and the court subsequently amended the order on January 31, 2007.
 

 II. APPEAL — RULE 3.851 MOTION
 

 A. Ineffective Assistance
 
 — Competency
 
 of a Child Witness
 

 Floyd first contends that trial counsel was ineffective for the failure to investigate and challenge the competency of a child witness. This claim is "without merit.
 

 Following the United States Supreme Court’s decision in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be met. First, the defendant must establish that counsel’s performance was deficient. Second, the defendant must establish that counsel’s deficient performance prejudiced him or her.
 
 See Carratelli v. State,
 
 961 So.2d 312, 320 (Fla.2007) (quoting
 
 Strickland,
 
 466 U.S. at 687, 104 S.Ct. 2052);
 
 Mendoza v. State,
 
 964 So.2d 121, 127 (Fla.2007);
 
 Philmore v. State,
 
 937 So.2d 578, 583 (Fla.2006).
 

 To establish deficiency under
 
 Strickland,
 
 the defendant must prove that counsel’s performance was unreasonable under “prevailing professional norms.”
 
 Morris v. State,
 
 931 So.2d 821, 828 (Fla.2006) (quoting
 
 Strickland,
 
 466 U.S. at 688, 104 S.Ct. 2052). To establish prejudice, the defendant must prove that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.”
 
 Id.
 
 (quoting
 
 Strickland,
 
 466 U.S. at 694, 104 S.Ct. 2052). Both prongs of the
 
 Strickland
 
 test present mixed questions of law and fact. For this reason, we employ a mixed standard of review — deferral to the factual findings of the circuit court that are supported by competent, substantial evidence, but de novo review of legal conclusions.
 
 See Sochor v. State,
 
 883 So.2d 766, 771-72 (Fla.2004).
 

 There is a strong presumption that the performance of trial counsel was not ineffective.
 
 See Strickland,
 
 466 U.S. at 690, 104 S.Ct. 2052. To fairly assess attorney performance, every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of the challenged conduct, and to evaluate the conduct from the perspective of counsel at the time.
 
 See id.
 
 at 689, 104 S.Ct. 2052. The defendant bears the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ”
 
 Id.
 
 (quoting
 
 Michel v. Louisiana,
 
 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Accordingly, judicial scrutiny of the performance by trial counsel must be highly deferential.
 
 See id.
 
 In
 
 Occhicone v. State,
 
 768 So.2d 1037, 1048 (Fla.2000), we explained that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 

 In Florida, whether a child witness is competent to testify is based on “his or her intelligence, rather than his or her age, and, in addition, whether the child possesses a sense of obligation to tell the truth.”
 
 Lloyd v. State,
 
 524 So.2d 396, 400 (Fla.1988);
 
 see Bell v. State,
 
 93 So.2d 575, 577 (Fla.1957). Accordingly, when evaluating the competency of a child, the trial court should consider the following:
 

 
 *444
 
 (1) whether the child is capable of observing and recollecting facts; (2) whether the child is capable of narrating those facts to the court or to a jury, and (3) whether the child has a moral sense of the obligation to tell the truth.
 

 Griffin v. State,
 
 526 So.2d 752, 753 (Fla. 1st DCA 1988) (citing
 
 Lloyd,
 
 524 So.2d at 400);
 
 see also Baker v. State,
 
 674 So.2d 199, 200 (Fla. 4th DCA 1996). The trial judge has the discretion to decide whether a witness of tender age is competent to testify and, accordingly, the decision to allow a child to testify is reviewed for abuse of discretion.
 
 See Lloyd,
 
 524 So.2d at 400.
 

 Here, a sufficient factual basis existed for trial counsel to reasonably conclude that LaJade and J.J. were competent witnesses. Trial counsel deposed both children before trial and had the opportunity to observe their demeanor. At these depositions, counsel questioned the children about their relationships with the victim and the defendant, them memories of the murder, and their abilities to relate the event truthfully. Each child answered the questions clearly and consistently. Despite a few minor discrepancies (which were understandable due to the speed at which the events unfolded, and the shocking effect of witnessing their grandmother’s murder), the versions of the event given by these two prospective witnesses corroborated each other. Therefore, it was reasonable for trial counsel to rely upon what he observed during the deposition to conclude that LaJade and J.J. were capable of observation and recollection of facts, were capable of narration with regard to those facts, and had a moral sense of the obligation to tell the truth.
 
 See Griffin,
 
 526 So.2d at 753.
 

 Trial counsel was not deficient when he made a strategic decision not to challenge the qualification of the witnesses by the trial court or otherwise attack the children’s competency. During the evidentia-ry hearing, trial counsel testified that his general practice was not to verbally attack a child unless he could prove with certainty that the child was lying. This practice was consistent with trial counsel’s articulated strategy, which was not to antagonize a “death qualified jury.” Indeed, an attorney who aggressively questions a distressed child runs a high risk of alienating jurors, something which a capital defendant should avoid. Accordingly, the decision of trial counsel here constituted reasonable strategy.
 

 We further conclude that Floyd has failed to establish that he was prejudiced by a failure to object. The two child witnesses were sufficiently examined and properly qualified by the court. Specifically, LaJade proved her intelligence level by correctly counting numbers and reciting the alphabet. She also understood her obligation to tell the truth “no matter what.” Likewise, J.J. established his intelligence in that he stated his education level and the subjects he studied in school, and he made an earnest effort to pass the judge’s “quiz” on mathematics. J.J. also understood the concept of lying, the consequence of lying, and his obligation to tell the truth. Finally, J.J. promised to answer each question truthfully. Based on their answers, the trial court properly concluded that LaJade and J.J. were competent witnesses, and any objection presented by trial counsel would have been meritless.
 
 See Baker,
 
 674 So.2d at 200-01 (finding no abuse of discretion where the trial court qualified a six-year-old child after the child demonstrated that she knew her age, where she went to school, where she went to church, and the colors of clothing; the child established that she possessed a sense to tell
 
 *445
 
 the truth; and the child stated that she knew it was wrong to lie).
 

 Floyd seems to contend that the in-court voir dire examination of La-Jade and J.J. was insufficient to establish competency, and that a separate hearing was required. However, a separate hearing has never been required, and Floyd’s argument is without merit.
 
 See, e.g., Glendening v. State,
 
 536 So.2d 212, 216 (Fla.1988) (child witness questioned on voir dire at the beginning of her videotaped testimony);
 
 Bennett v. State,
 
 971 So.2d 196, 198 (Fla. 1st DCA 2007) (trial court conducted a competency examination on the morning of the trial). Floyd also suggests that the allegedly contradictory statements of La-Jade and J.J. create doubts with regard to the competency of the children to testify. We disagree. Most of these statements are mere imperfect expressions attributable to the witnesses’ tender age and do not affect the material portions of the children’s testimony.
 
 See Lloyd,
 
 524 So.2d at 400 (holding that the inconsistencies in various statements were nothing more than what one could expect from a child of five or six years of age and were not so egregious as to require the total rejection of the testimony). Further, although there was a discrepancy between the testimony of the children with regard to the physical location of Floyd when the third gunshot was fired,
 
 [7]
 
 this discrepancy can be explained by the location of the witnesses, each of whom had a different view from which to observe the shooting. Accordingly, the failure to challenge the competency of the child witnesses did not render trial counsel ineffective.
 

 B. Ineffective Assistance
 
 — Hearsay
 

 Floyd next contends that trial counsel was ineffective for the failure to timely object to various hearsay statements admitted during trial with regard to the children’s identification of Floyd as the shooter and to the testimony of Figuero that J.J. was “smart” and “bright.” We conclude that Floyd is not entitled to relief.
 

 First, trial counsel’s performance was not deficient because counsel testified during the evidentiary hearing that he made a strategic decision “not to pepper the record with unnecessary objections for fear of irritating the jury.” Moreover, the record demonstrates that trial counsel objected to most of the hearsay testimony with which Floyd takes issue. One hearsay statement to which trial counsel did not object was the statement of Ms. Figue-ro’s son, who testified that he heard J.J. inform Ms. Figuero that Floyd shot Ms. Goss. However, trial counsel was not deficient for failing to object because J.J.’s statement qualified as an excited utterance. This exception to the hearsay rule authorizes admission of hearsay containing “[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” § 90.803(2), Fla. Stat. (Supp.1998). A statement qualifies as an excited utterance if it was made (1) with regard to an event that was startling enough to cause nervous excitement, (2) before there was time for the declarant to contrive or misrepresent, and (3) while the declarant was under the stress or excitement caused by the event.
 
 See Johnson v. State,
 
 969 So.2d 938, 949 (Fla.2007),
 
 cert. denied,
 
 - U.S. -, 128 S.Ct. 2056, 170 L.Ed.2d 799 (2008).
 

 Here, J.J.’s immediate statement related to the shooting of his grandmother by his stepfather, an event that is without ques
 
 *446
 
 tion shocking enough to cause nervous excitement. The statement was made within seconds of Ms. Goss’s murder and while the children were running from the murder scene. The children were panicking, crying, and begging for help when they spoke to Figuero. The record supports a finding that J.J. did not have time to contrive or misrepresent, and that he was still under the stress caused by the startling event when he made this statement.
 
 See Williams v. State,
 
 967 So.2d 735, 748-49 (Fla.2007) (holding that the declarant’s 911 statements approximately twenty minutes after she was stabbed qualified as an excited utterance),
 
 cert. denied,
 
 - U.S. -, 128 S.Ct. 1709, 170 L.Ed.2d 519 (2008);
 
 Damren v. State,
 
 838 So.2d 512, 520 (Fla.2003) (holding that statement qualified as an excited utterance where it was made shortly after the victim’s murder, the de-clarant was in a highly agitated state when he made the statements, and the declarant feared for his own life because of the homicide he had just witnessed);
 
 Ware v. State,
 
 596 So.2d 1200, 1201 (Fla. 3d DCA 1992) (declarant’s call to 911 after finding her son bleeding profusely from a neck wound qualified as an excited utterance).
 

 Floyd also contends that trial counsel was deficient for the failure to object to Figuero’s comment that J.J. was “bright” and “smart,” and that this testimony constituted impermissible bolstering of J.J. as a witness. We disagree. Counsel testified during the evidentiary hearing that he made a strategic decision to limit unnecessary objections to avoid “irritating the jury during the course of the trial.” Trial counsel was not ineffective for following a trial strategy that, in hindsight, did not ultimately result in the defendant’s acquittal.
 
 See Dufour v. State,
 
 905 So.2d 42, 62 (Fla.2005). Floyd has also failed to demonstrate prejudice because there was no reasonable probability that, had trial counsel objected, the results of the trial would have been impacted, and our confidence in this outcome is not undermined. The record demonstrates that J.J. was properly qualified by the court and had shown sufficient intelligence to testify with coherence, consistency, and clarity. It is unlikely that Figuero’s isolated comments with regard to J.J. as a “bright” and “smart” child impacted the jury’s evaluation of his actual testimony, and they do not undermine our confidence in the outcome here.
 

 Accordingly, this claim is without merit.
 

 C. Denial of Postconviction Discovery Request
 

 Floyd next challenges the postconviction court’s denial of his requests to subpoena the counseling records of the three children and to depose J.J.
 
 [8]
 
 The ruling of a postconviction court on a motion for discovery is reviewed for an abuse of discretion.
 
 See Reaves v. State,
 
 942 So.2d 874, 881 (Fla.2006). With regard to the counseling records of the children, the Florida Evidence Code generally provides that records made during the course of treatment of a patient’s mental or emotional condition are privileged:
 

 A patient has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications or records made for the purpose of diagnosis or treatment of the patient’s mental or emotional condition ... between the patient and the psychotherapist, or persons who are participating in the diagnosis or treatment under the direction of the psychotherapist.
 
 *447
 
 This privilege includes any diagnosis made, and advice given, by the psychotherapist in the course of that relationship.
 

 § 90.503(2), Fla. Stat. (2005). This privilege may be claimed by certain individuals, including the patient himself or herself,
 
 see id.
 
 § 90.503(3)(a), and the psychotherapist on behalf of the patient.
 
 See id.
 
 § 90.503(3)(d) (“The authority of a psychotherapist to claim the privilege is presumed in the absence of evidence to the contrary.”). Here, the postconviction record reflects that legal counsel for the entity that provided the children with counseling “absolutely” asserted that the records were privileged and confidential.
 
 [9]
 

 In
 
 State v. Roberson,
 
 884 So.2d 976, 979 (Fla. 5th DCA 2004),
 
 review denied,
 
 895 So.2d 406 (Fla.2005), the Fifth District Court of Appeal held that “neither the Evidence Code, nor any applicable constitutional principle allows the invasion of a victim’s privileged communications with her psychotherapist.” The district court quashed a trial court order that granted discovery into the mental health records of a child sex-crime victim and quoted the United States Supreme Court for the proposition that
 

 [ effective psychotherapy ... depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.
 

 Id.
 
 (quoting
 
 Jaffee v. Redmond,
 
 518 U.S. 1, 10, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996)). Despite the statutory privilege, section 394.4615(2)(c), Florida Statutes (2005), allows a court to order the release of confidential clinical records when “there is good cause for disclosure.”
 

 Here, postconviction counsel contended that he sought the records in light of the fact that the prosecutor had at one time expressed concern about the mental health of the children. However, this does not constitute “good cause.” Rather, it is completely reasonable, if not expected, for children who witnessed the murder of their grandmother to have psychological issues arising from the event. Moreover, during trial, J.J. and LaJade were qualified by the trial court for competency and testified with regard to the events that occurred on the night of the murder. Accordingly, the jury had the opportunity to observe the children and weigh their credibility when it evaluated the guilt or innocence of Floyd. We do not understand what disclosure of these privileged communications could have achieved at the postconviction stage. Consequently, Floyd has failed to demonstrate that the postconviction court abused its discretion when it denied the request to compel disclosure of counseling records.
 

 With regard to deposing J.J., postconviction counsel asserted that he wished to inquire with regard to lighting conditions on the night of the murder and the ability of J.J. to observe the person who was in Ms. Goss’s house. However, as previously noted, the trial court determined competency before he testified. Accordingly, any issue with regard to his competency should have been raised on
 
 *448
 
 direct appeal and is procedurally barred at this time. Further, while postconviction counsel certainly may assert that trial counsel was ineffective for the failure to question J.J. about lighting conditions, we agree with the trial court that to depose J.J. seven years after the murder merely to adduce whether any part of his recollection has changed is of dubious relevance to an effectiveness evaluation of trial counsel. We find no abuse of discretion on the part of the trial court when it denied the request to depose J.J.
 

 I). Ineffective Assistance
 
 — Evidence
 
 of Prior Bad Acts
 

 Floyd next contends that his counsel was ineffective for the failure to object to, and seek the exclusion of, his prior threat to Trelane, which he contends constitutes inadmissible
 
 Williams
 
 rule
 
 [10]
 
 evidence of prior bad acts. Floyd also asserts that the threat was subject to the marital privilege under the Florida Evidence Code and was inadmissible on that basis as well. During the evidentiary hearing, trial counsel testified that he acquiesced to the introduction of the threat to demonstrate that the shooting resulted from a domestic dispute, which he believed would lead to vacation of the death penalty and imposition of a life sentence on appeal. We conclude that trial counsel was not ineffective.
 

 First, Floyd’s threat to “kill Trelane or someone she loved as a
 
 reprisal for her drinking or if she ever attempted to run or hide from him,, ” Floyd,
 
 850 So.2d at 388 (emphasis supplied), demonstrated the motive behind the murder of Ms. Goss and was inextricably intertwined with that murder. Therefore, it was not true
 
 Williams
 
 rule evidence.
 
 See Griffin v. State,
 
 639 So.2d 966, 968 (Fla.1994) (“[Evidence of uncharged crimes which are inseparable from the crime charged, or evidence -which is inextricably intertwined with the crime charged, is not
 
 Williams
 
 rule evidence.”). Rather, the evidence of the threat to Trelane was admissible under section 90.402, Florida Statutes (1997), because “it [was] a relevant and inseparable part of the act which [was] in issue.... [I]t [was] necessary to admit the evidence to adequately describe the deed.”
 
 Griffin,
 
 639 So.2d at 968 (quoting Charles W. Ehrhardt,
 
 Florida Evidence
 
 § 404.7 (1993 ed.)). Therefore, based upon
 
 Williams
 
 rule precedent, trial counsel would not have succeeded even if he had objected to the introduction of this prior threat.
 

 Floyd is correct that in Florida, “[a] spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.” § 90.504, Fla. Stat. (1999). Either spouse may claim the privilege.
 
 See id.
 
 However, there is no privilege in a criminal proceeding in which one spouse is charged with a crime committed against the person or property of the other spouse.
 
 See id.
 
 Floyd was charged with, among other things, aggravated assault against his wife, Trelane. The spousal privilege was not available as long as Floyd stood trial for aggravated assault. Floyd asserts that trial counsel should have advised him to plead guilty to the aggravated assault charge so that he could have avoided the criminal-prosecution exception to the spousal evidentiary privilege. However, Floyd alleges no facts with regard to the deficient performance of counsel in this respect. He only asserts that he failed to plead guilty to the aggravated assault charge and then explains the consequences
 
 *449
 
 of the lost plea. Floyd has failed to meet his burden to establish
 
 Strickland,
 
 deficiency.
 

 Moreover, we conclude that trial counsel did not perform deficiently. This Court has held that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
 
 Occhicone,
 
 768 So.2d at 1048. We note that trial counsel initially did object to the purported
 
 Williams
 
 rule evidence, including the threat against Tre-lane. However, counsel eventually abandoned these objections in an attempt to place the murder in a domestic-dispute context as a means to avoid the death sentence. At the time Floyd was tried, there were decisions which had previously held that a killing under circumstances resulting from an ongoing and heated domestic dispute may render a death sentence not proportionate, provided the defendant had not been convicted of a prior similar violent crime.
 
 See Blakely v. State,
 
 561 So.2d 560, 561 (Fla.1990);
 
 see also Garron v. State,
 
 528 So.2d 353, 361 (Fla.1988) (“[W]hen the murder is a result of a heated domestic confrontation, the penalty of death is not proportionally warranted.”). Although this Court later clarified that it “does not recognize a domestic dispute exception in connection with death penalty analysis,”
 
 Lynch v. State,
 
 841 So.2d 362, 377 (Fla.2003), this further clarification came years after Floyd’s trial.
 

 Furthermore, evidence of an ongoing domestic dispute could help a defendant avoid a finding of the cold, calculated, and premeditated aggravating circumstance (CCP).
 
 See Evans v. State,
 
 838 So.2d 1090, 1098 (Fla.2002) (“In some murders that [have] resulted] from domestic disputes, we have determined that CCP was erroneously found because the heated passions involved were antithetical to ‘cold’ deliberation.”);
 
 Santos v. State,
 
 591 So.2d 160, 162-63 (Fla.1991) (CCP inapplicable where the defendant was involved in an highly emotional domestic dispute with victim and her family, even though defendant had acquired a gun in advance and made previous death threats against victim; murder was not “cold,” even though it may have been calculated). Thus, at the time of the Floyd trial for the murder of Ms. Goss, it was reasonable for trial counsel to attempt to portray this case as a domestic dispute as a means to avoid either a death sentence or application of the CCP aggravating circumstance. Although this strategy was not ultimately successful, we conclude that it was sound. Accordingly, Floyd is not entitled to relief based on this claim of ineffectiveness.
 

 E. Ineffective Assistance
 
 — Failure
 
 to Impeach Tashoni Lamb
 

 Under this claim with multiple subparts, Floyd asserts that his counsel was ineffective for the failure to impeach witness Tashoni Lamb with regard to prior statements that she made to the police which, according to Floyd, differed from her trial testimony. During her trial testimony, Lamb stated that Floyd told her that he shot Ms. Goss because she threatened to report him to the police. ' On the other hand, a police report indicated that Lamb informed the police shortly after Floyd was arrested that Floyd stated he “shot Ms. Goss because she made him angry.” The report also referenced an earlier audiotaped interview of Lamb, in which she explained that Floyd stated he killed Ms. Goss because she was “running her mouth, talking.”
 

 Floyd contends that Lamb’s initial statements to the police were inconsistent with her trial testimony that Floyd said he shot Ms. Goss because she was going to call the police. Floyd claims that counsel was inef
 
 *450
 
 fective for the failure to use Lamb’s prior inconsistent statements to impeach her because the jury was allowed to hear that the sole reason for the shooting was that Ms. Goss had threatened to call the police. According to Floyd, this testimony eliminated any possibility that the shooting was done in the heat of passion and destroyed the chance for a conviction for second-degree murder. Additionally, Floyd notes that on direct appeal, this Court found that the avoid arrest aggravating factor was supported by Lamb’s testimony.
 
 See Floyd,
 
 850 So.2d at 406. Floyd further asserts that the State committed a Brady
 
 [11]
 
 violation when it failed to disclose Lamb’s purportedly inconsistent statements to defense counsel and a
 
 Giglio
 

 [12]
 

 violation when it allowed Lamb to testify that Floyd admitted to shooting Ms. Goss because she had threatened to call the police.
 

 With regard to the failure to cross-examine Lamb concerning her purportedly inconsistent statements, the trial court concluded that “there was absolutely no evidence presented by Mr. Floyd at the evidentiary hearing that ... Lamb’s differently worded statements were anything other than a witness recalling the same facts and using different semantics on different days.” We agree. Lamb’s statement that Floyd’s motive for shooting Ms. Goss was because she was “running her mouth” could clearly have encompassed a threat by Ms. Goss that she intended to call the police because of Floyd’s prior assault upon Trelane. There is no evidence that the two statements by Lamb are irreconcilably inconsistent. Indeed, an individual would not be expected to use identical words when recounting the same event on two separate occasions. Accordingly, trial counsel was not deficient for failing to impeach Lamb with regard to these two statements.
 
 [13]
 

 Floyd’s
 
 Brady
 
 allegation that the State failed to advise defense counsel of the “differing” statements by Lamb also fails. Under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the State is required to disclose material information within its possession or control that is favorable to the defense.
 
 See Mordenti v. State,
 
 894 So.2d 161, 168 (Fla.2004). To establish a
 
 Brady
 
 violation, the defendant must demonstrate (1) that favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) the defendant was prejudiced.
 
 See Strickler v. Greene,
 
 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999);
 
 see also Way v. State,
 
 760 So.2d 903, 910 (Fla.2000). To meet the materiality prong, the defendant must demonstrate “a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial.”
 
 Smith v. State,
 
 931 So.2d 790, 796 (Fla.2006) (citing Strickler, 527 U.S. at 289, 296, 119 S.Ct. 1936). At issue is whether “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.”
 
 Id.
 
 (quoting
 
 Strickler,
 
 527 U.S. at 290, 119 S.Ct. 1936).
 

 
 *451
 
 With regard to
 
 Brady’s
 
 second prong, this Court has explained that “[t]here is no
 
 Brady
 
 violation where the information is equally accessible to the defense and the prosecution, or where the defense either had the information or could have obtained it through the exercise of reasonable diligence.”
 
 Provenzano v. State,
 
 616 So.2d 428, 430 (Fla.1993) (citing
 
 Hegwood v. State,
 
 575 So.2d 170, 172 (Fla.1991);
 
 James v. State,
 
 453 So.2d 786, 790 (Fla.1984)). As we have previously stated:
 

 Although the “due diligence” requirement is absent from the Supreme Court’s most recent formulation of the
 
 Brady
 
 test, it continues to follow that a
 
 Brady
 
 claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot be found to have been withheld from the defendant.
 

 Owen v. State,
 
 986 So.2d 534, 547 (Fla.2008) (quoting
 
 Occhicone,
 
 768 So.2d at 1042). Thus, evidence is not suppressed where the defendant was aware of the information.
 
 See Way,
 
 760 So.2d at 911;
 
 see also Tompkins v. State,
 
 872 So.2d 230, 239 (Fla.2003) (no suppression where defense was given illegible copy of police report because defense knew about report and could have requested a legible copy);
 
 Provenzano,
 
 616 So.2d at 430 (no
 
 Brady
 
 violation where defendant could have obtained his jail records from jail officials and could have reviewed the notes of the State expert witness if he had requested them).
 

 Here, the record shows that Floyd was aware of the existence and content of the taped interview with Lamb. Indeed, the police report, which had been provided to Floyd, referred to the tape. The postcon-vietion court correctly noted that Floyd could have requested the tape from the police had he so desired. In light of Floyd’s knowledge of the tape, it could not have been “suppressed.” Therefore, Floyd is not entitled to relief based on this
 
 Brady
 
 claim.
 

 A
 
 Giglio
 
 violation is demonstrated when a defendant establishes that (1) the prosecutor presented or failed to correct false testimony; (2)
 
 the prosecutor knew the testimony was false;
 
 and (3) the false evidence was material.
 
 See Guzman v. State,
 
 941 So.2d 1045, 1050 (Fla.2006). Once the first two prongs are established, the false evidence is deemed material if there is any reasonable possibility that it could have affected the jury’s verdict.
 
 See id.
 
 at 1050-51. Under this standard, the State has the burden to prove that false testimony was not material by demonstrating that it was harmless beyond a reasonable doubt.
 
 See id.
 
 at 1050.
 

 Floyd has failed to establish that Lamb’s trial testimony — i.e., Floyd stated that he shot Ms. Goss because she threatened to report him to the police — was false. As previously discussed, Lamb’s report to the police that Floyd admitted to killing Ms. Goss because she was “running her mouth, talking” and her trial testimony were not inherently inconsistent. Floyd has not established that Lamb’s trial testimony was false or, equally significant, that the prosecutor
 
 knew
 
 it was false. Hence, Floyd has failed to demonstrate that a
 
 Giglio
 
 violation occurred.
 

 Floyd next contends that counsel was ineffective for the failure to impeach Lamb with evidence that (1) the domestic-violence charge against Lamb’s boyfriend, Kenneth Davis, was nolle prossed; (2) Lamb was angry at Floyd because he failed to intervene when Davis battered her; and (3) the State threatened Lamb with prosecution for harboring Floyd if she did not testify against him. Floyd also asserts that the State committed a
 
 Brady
 
 violation when it failed to
 
 *452
 
 inform the defense of Davis’s nolle prose-qui and to provide the defense with tapes of Lamb’s recorded police interview. We reject each of these claims as without merit.
 

 Floyd’s ineffectiveness claim with regard to the failure to impeach Lamb based on the nolle prosequi of Kenneth Davis, and Lamb’s alleged anger with Floyd, is similarly without merit. There was no evidence presented during the evidentiary hearing that the nolle prosequi of Davis was in any way related to Floyd’s criminal case, or that Lamb fabricated her testimony because she was angry with Floyd. Additionally, no evidence was offered in support of the assertion that the State threatened Lamb with prosecution for harboring Floyd if she did not testify against him. Accordingly, trial counsel was not deficient for the failure to use this information to impeach Lamb’s trial testimony.
 

 Further, Floyd’s inability to demonstrate that the nolle prosequi was relevant impeachment evidence — other than pure speculation that Lamb might have reached an agreement with the State to testify against Floyd in exchange for the nolle prosequi of the charges against her boyfriend — defeats his
 
 Brady
 
 claim. As previously stated, there was no evidence offered during the evidentiary hearing to indicate that there was such an agreement between Lamb and the State. Accordingly, the nolle prosequi of Davis was immaterial to Lamb’s testimony during the trial.
 
 See Strickler,
 
 527 U.S. at 281-82, 119 S.Ct. 1936.
 

 F. Ineffective Assistance
 
 — Failure
 
 to Present Alibi
 

 Floyd next asserts that trial counsel was ineffective for the failure to present evidence of an alibi during the trial. We disagree. Floyd wanted his trial counsel to present the following alibi theory: After fleeing from the sheriff’s office, Floyd called his mother from a pay phone and, thereafter, his mother and two brothers took him to the bus station in St. Augustine.
 

 Trial counsel testified during the eviden-tiary hearing that he refused to offer evidence of Floyd’s purported alibi because he believed that to do so would commit a fraud on the court. Trial counsel explained that he investigated the purported alibi and discovered that (1) the phone booth from which Floyd claimed to have made the call had been removed two years before the alleged phone call; (2) contrary to Floyd’s account, one of Floyd’s brothers, who Floyd claimed transported him to the bus station, admitted that he was sleeping at that time; (3) a statement of Floyd’s father contradicted that of his mother; and (4) Floyd’s father contacted Lamb in an attempt to persuade her to change her testimony so that the alibi would appear sound. Based on these facts, it was reasonable for trial counsel to conclude that the alibi proposed by Floyd was fraudulent. It was completely appropriate for trial counsel to take no action that he believed would perpetrate a fraud upon the court. Counsel’s actions in this regard were
 
 not
 
 deficient, and there was no ineffectiveness.
 

 G. Ineffective Assistance
 
 — Failure
 
 to Present Mitigation Evidence
 

 Floyd contends that trial counsel was ineffective for failing to adequately investigate and present statutory and non-statutory mitigation. According to Floyd, had existing mitigation evidence been presented, the mitigating circumstances would have outweighed any aggravating circumstances, and the jury would have recommended a life sentence. Floyd also asserts that trial counsel was ineffective for the failure to object to an erroneous jury instruction which prohibited the jury from considering any nonstatutory mitigator
 
 *453
 
 aside from “other circumstance[s] of the offense.” Lastly, Floyd contends that the failure of trial counsel to seek a jury instruction based upon age as a mitigating circumstance constituted ineffective assistance. We reject each of these claims.
 

 With regard to assertions of penalty-phase ineffectiveness, we recently explained:
 

 “To succeed in an ineffective assistance of penalty phase counsel claim, the claimant must demonstrate that counsel performed deficiently and that such deficiency prejudiced his defense.”
 
 Hannon v. State,
 
 941 So.2d 1109, 1124 (2006) (citing
 
 Strickland,
 
 466 U.S. at 687, 104 S.Ct. 2052). “Prejudice, in the context of penalty phase errors, is shown where, absent the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or the deficiencies substantially impair confidence in the outcome of the proceedings.”
 
 Gaskin v. State,
 
 737 So.2d 509, 516 n. 14 (Fla.1999),
 
 receded from on other grounds by Nelson v. State,
 
 875 So.2d 579, 582-83 (Fla.2004).
 

 Lynch v. State,
 
 2 So.3d 47, 70 (Fla.2008). We have further established standards for the review of ineffectiveness challenges that are based on allegedly defective investigation and presentation of mental mitigation:
 

 This Court has found counsel’s performance was deficient where counsel “never attempted to meaningfully investigate mitigation” although substantial mitigation could have been presented.
 
 Rose,
 
 675 So.2d at 572;
 
 Hildwin v. Dugger,
 
 654 So.2d 107, 109 (Fla.1995) (“woefully inadequate” investigation failed to reveal a large amount of mitigating evidence, such as prior psychiatric hospitalizations and statutory mental health mit-igators);
 
 State v. Lara,
 
 581 So.2d 1288, 1289 (Fla.1991) (finding counsel “virtually ignored” preparation for penalty phase).
 

 However, in those cases where counsel did conduct a reasonable investigation of mental health mitigation prior to trial and then made a strategic decision not to present this information, we have affirmed the trial court’s findings that counsel’s performance was not deficient.
 
 See Rutherford,
 
 727 So.2d at 223;
 
 Jones,
 
 732 So.2d at 317;
 
 Rose v. State,
 
 617 So.2d 291, 293-94 (Fla.1993). This case is similar to
 
 Jones,
 
 where the defendant had been examined prior to trial by a mental health expert who gave an unfavorable diagnosis. As we concluded in
 
 Jones,
 
 the first evaluation is not rendered less than competent “simply because appellant has been able to provide testimony to conflict” with the first evaluation. 732 So.2d at 320;
 
 see Rose,
 
 617 So.2d at 295. Also instructive is our opinion in
 
 Rose,
 
 where a psychologist advised trial counsel prior to the penalty phase that the defendant suffered from antisocial personality disorder and ruled out the possibility of an organic brain disorder. 617 So.2d at 294. In both
 
 Rose
 
 and
 
 Jones,
 
 we affirmed the trial court’s finding that counsel had made a reasonable tactical decision not to further pursue an investigation of mental health mitigation evidence after receiving an initial unfavorable diagnosis.
 
 See Jones,
 
 732 So.2d at 320 n. 5;
 
 Rose,
 
 617 So.2d at 294.
 

 Asay v. State,
 
 769 So.2d 974, 985-86 (Fla.2000).
 

 Here, the postconviction court found, based on competent, substantial evidence, that counsel properly relied on Dr. Krop — an experienced and well-documented expert — to conduct a thorough mental-health evaluation. The court ultimately concluded that a thorough mental-health
 
 *454
 
 evaluation had, in fact, been performed. Trial counsel’s investigation into mental-health mitigation “is not rendered incompetent merely because the defendant has now secured the testimony of a more favorable mental health expert.”
 
 Asay,
 
 769 So.2d at 986.
 

 Furthermore, the postconviction court found, based on competent, substantial evidence, that trial counsel made a strategic decision not to present mitigation evidence after consultation with Dr. Krop. It was reasonable for trial counsel to conclude that the evidence offered in mitigation would do more harm than good in light of Floyd’s antisocial personality disorder diagnosis, the fact that he killed his brother at age fourteen, and the inconsistencies between the statements of Floyd’s parents. This strategic decision did not render trial counsel’s performance deficient.
 

 Floyd further contends that after Dr. Krop advised counsel that he should not testify during the penalty phase, trial counsel totally abdicated his duty to investigate mitigation. Conversely, trial counsel testified during the evidentiary hearing that he investigated Floyd’s background, but was unable to locate much mitigation. Trial counsel explained that he avoided the incident in which Floyd killed his brother because he had spoken with a police officer, who informed counsel that the prior killing “was a whole lot worse [than the charge indicated], toward the premeditated range.”
 

 Despite the alleged failures of trial counsel to offer mitigation, a review of the record demonstrates that postconviction counsel did not offer a single family member, teacher, or acquaintance to provide information about Floyd’s upbringing or with regard to any abuse or neglect that he allegedly suffered as a child. Rather, the only witnesses offered during the post-conviction hearing were experts who testified with regard to Floyd’s mental health. There was no non-mental-health-related evidence presented during the postconviction proceedings, and we conclude that Floyd has failed to establish that his trial counsel exhibited deficient performance with regard to the mitigation investigation.
 
 See generally Holland v. State,
 
 916 So.2d 750, 757 (Fla.2005) (“[C]ounsel cannot be deemed deficient for failing to investigate or present mitigation evidence
 
 unless the defendant establishes that mitigation exists.”
 
 (emphasis supplied)).
 

 With regard to the failure of trial counsel to object to the jury instruction that addressed nonstatutory mitigation, Floyd has not established that any purported error in the jury instruction satisfies the prejudice requirement of
 
 Stride-land,.
 
 In our decision that affirmed Floyd’s conviction and sentence, we specifically held that when we further considered “the three strong aggravating factors present in this case, the possible mitigation factors, and the eleven-to-one jury recommendation for a sentence of death,” we concluded that
 
 “a perfect instruction would not have in any way altered, the jury’s recommendation
 
 here.”
 
 Floyd,
 
 850 So.2d at 403 (emphasis supplied).
 

 Finally, with regard to the mitigating circumstance of age, we have held:
 

 [ W]here the defendant is not a minor, as in the instant case, “no per se rale exists which pinpoints a particular age as an automatic factor in mitigation.”
 
 [Shellito v. State,
 
 701 So.2d 837, 843 (Fla.1997)]. The existence and weight to be given to this mitigator depends on the evidence presented at trial and the sentencing hearing.
 
 See id.
 
 For example, this Court has held that age twenty, in and of itself, does not require a finding of the age mitigator.
 
 See Garcia v. State,
 
 492 So.2d 360, 367 (Fla.1986).
 

 
 *455
 
 In
 
 Gudinas v. State,
 
 693 So.2d 953 (Fla.1997), we held, “Although Gudinas is certainly correct that he had a troubling past and had always been small for his age, there was no evidence presented that he was unable to take responsibility for his acts and appreciate the consequences thereof
 
 at the time of the murders.” Id.
 
 at 967. In that case, we found that there was substantial, competent evidence in the record to support the trial court’s finding “that Gudinas was mentally and emotionally mature enough that his age should not be considered as a mitigator.”
 
 Id.
 

 Nelson v. State,
 
 850 So.2d 514, 528-29 (Fla.2003). In
 
 Nelson,
 
 this Court upheld the lower court’s rejection of the age miti-gator and concluded that evidence demonstrated the maturity of the defendant based on the following considerations:
 

 [ H]e obtained and temporarily held a job; he provided his child’s mother with money to buy necessities when she was visiting; Nelson did not have a home of his own, but arranged to stay with [others]; and Nelson did not have a driver’s license or a car, yet was able to travel places on his own.
 

 Id.
 
 at 529. Here, at the time of the murder, Floyd was twenty-one years old and married, he maintained employment, and he assumed responsibilities for a household and his wife’s children from a prior relationship. Since many aspects of Floyd’s life were consistent with that of a mature adult, it was not unreasonable for trial counsel to conclude that the age miti-gator was inapplicable.
 

 Accordingly, Floyd has failed to establish that trial counsel was ineffective, and we reject this claim.
 

 H. Ineffective
 
 Assistance—
 
 Jury Selection
 

 During voir dire, the following dialogue occurred:
 

 STATE: Mr. Wilkinson, you indicated you probably would not make it back to jury duty again.
 

 Is there anything in particular that would interfere with you being a good juror in this case for this week?
 

 VENIREMAN: Well, I don’t know about this week or any other week. But the only thing I know for sure is the justice system sometimes works in right ways and other times it don’t.
 

 If a man is sentenced to die in the electric chair, I feel they ought to go ahead after a certain period of time and go ahead and electrocute the man and get it over with, not give him a lifetime or send them over there for years and years and years, cost the taxpayer. My opinion, too much money.
 

 (Clapping erupted by prospective jurors.)
 

 THE COURT: Please, we need to maintain order. This is not a rooting session.
 

 Floyd contends that the comment by the prospective juror and the outbreak of applause fatally tainted the prospective jury panel. According to Floyd, trial counsel failed to object or seek a new panel, which would have required the court to question the panel as a means to separate those members who had been affected by the comment and those who were not improperly impacted. Floyd contends that the failure of counsel to affirmatively act constituted deficient performance that prejudiced his trial.
 

 On direct appeal, no claim was raised with regard to the comment by prospective juror Wilkinson. Accordingly, any challenge to this comment at this time is procedurally barred.
 
 See Harvey v. Dugger,
 
 656 So.2d 1253, 1256 (Fla.1995) (“[I]ssues that could have been, but were not, raised on direct appeal are not cognizable through collateral attack.”). With regard
 
 *456
 
 to the ineffectiveness challenge, the post-conviction court found that Floyd failed to produce any evidence whatsoever to demonstrate how trial counsel was deficient. We agree and conclude that, based upon this failure, Floyd has not satisfied the burden of proof on an ineffectiveness claim.
 
 See Morris,
 
 931 So.2d at 828 (to establish a claim of ineffective assistance, “the defendant
 
 must show
 
 that counsel’s performance was deficient” (emphasis supplied) (quoting
 
 Strickland,
 
 466 U.S. at 687, 104 S.Ct. 2052)). Accordingly, Floyd is not entitled to relief.
 

 I. Due Process
 
 — Failure
 
 of Expert to Conduct Appropriate Tests
 

 Floyd next asserts that that he was deprived of his due process right to develop mitigating circumstances because Dr. Krop failed to conduct the appropriate tests for organic brain damage and mental illness and, as a result, Floyd was deprived of a fair penalty phase.
 

 A claim that a defendant has been deprived of his right to an evaluation by a competent mental-health expert may be raised under
 
 Ake v. Oklahoma,
 
 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Floyd did not raise an
 
 Ake
 
 claim in his direct appeal and, therefore, this claim is procedurally barred.
 
 See Marshall v. State,
 
 854 So.2d 1235, 1248 (Fla.2003). Moreover, even if not barred, this claim is without merit. As previously noted, the postconviction court found that Dr. Krop was a well-respected mental-health expert who had extensive experience, and that Dr. Krop performed a thorough mental-health evaluation of Floyd. Because these post-conviction findings were based on competent, substantial evidence, they should not be disturbed on appeal. Thus, Floyd also fails on the merits of his
 
 Alee
 
 claim.
 

 J. Ineffectiveness and Constitutional Violation
 
 — Shackling
 

 Floyd next contends that his constitutional rights were violated when he was shackled during his capital murder trial without any determination by the court that shackling was necessary. Evidence offered during the evidentiary hearing established that the purported “shackle” consisted of a leg brace that Floyd was compelled to wear on his leg while he was in the courtroom and before the jury. According to Floyd, trial counsel was ineffective because he acquiesced to the continued “shackling” of his client, which was overtly visible to the jurors, and the trial court never polled the jurors to determine whether any of them had been prejudiced by the sight of Floyd in shackles. Floyd further asserts that even if the leg brace had been deemed necessary during the penalty phase, the court never gave a cautionary instruction to the jurors. Floyd contends that he was prejudiced because, when the jury saw him in shackles, they were led to believe that the court possessed evidence of future dangerousness and uncontrollable behavior, which implied that death would be the only proper penalty-
 

 In support of this claim, Floyd relies upon the decision of the United States Supreme Court in
 
 Deck v. Missouri,
 
 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), that “courts cannot routinely place defendants in shackles or other physical restraints
 
 visible to the jury
 
 during the penalty phase of a capital proceeding.”
 
 Id.
 
 at 633, 125 S.Ct. 2007 (emphasis supplied). However, the Court also clarified that this constitutional directive is not absolute: “It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling. In so doing, it accommodates the important need to protect the courtroom and its occupants.”
 
 Id.
 
 Moreover,
 
 Deck,
 
 which was decided in 2005, does not apply
 
 *457
 
 retroactively.
 
 See Marquard v. Sec’y, Dep’t of Corr.,
 
 429 F.3d 1278, 1311 (11th Cir.2005),
 
 cert. denied,
 
 547 U.S. 1181, 126 S.Ct. 2356, 165 L.Ed.2d 283 (2006), and Floyd’s criminal trial occurred in 2000.
 

 Although
 
 Deck
 
 does not apply to Floyd, “[s]ince at least 1987, the law in Florida has been that shackling a defendant during the penalty phase without ensuring that his due process rights are protected is a sufficient ground for reversing a death sentence.”
 
 Hill v. State,
 
 921 So.2d 579, 585 (Fla.2006). A claim based on unconstitutional shackling, however, is procedurally barred unless raised on direct appeal.
 
 See Sired v. State,
 
 773 So.2d 34, 41 n. 11 (Fla.2000). Since a challenge to the leg brace worn by Floyd was
 
 not
 
 raised on direct appeal, this claim is procedurally barred.
 

 Conversely, the claim that trial counsel was ineffective for failing to object to his shackling is properly presented in this collateral proceeding.
 
 See Hendrix v. State,
 
 908 So.2d 412, 425 (Fla.2005);
 
 Marquard v. State,
 
 850 So.2d 417, 431 (Fla.2002);
 
 Sims v. State,
 
 602 So.2d 1253, 1256 (Fla.1992). Our decision in
 
 Hendrix
 
 on the matter of shackling is instructive. There, the postconviction court found:
 

 At the evidentiary hearing Judge Lockett, the Judge who presided over the trial, and Art Newcombe, the bailiff in charge of security during the Defendant’s trial, as well as the testimony of various attorneys and even a witness who was present at the trial all testified that the jury would not have been able to see Mr. Hendrix’s shackles. Further, Mr. Newcombe testified that he was aware, prior to trial from the deputies at the Lake County Jail, that a shank made from an air conditioning louver was found in the Defendant’s cell approximately two and a half months before the trial. He also said that about a month after finding the shank, Mr. Hendrix asked [one] of the cleanup men at the jail to get him a louvered slat from an air conditioning unit. The Defendant had also been implicated in an escape plot with another prisoner, just three weeks before trial.
 

 Hendrix,
 
 908 So.2d at 425 (quoting trial court’s order). This Court held that counsel was not ineffective for failing to object to the use of shackles because:
 

 It is highly unlikely that objecting to the shackles would have produced any results, particularly where both the judge and the bailiff knew that Hendrix was an escape risk and was found with a weapon in his cell. Moreover, the court undertook very careful methods to ensure that the jury was not aware of the shackles. Second, Hendrix has failed to show any prejudice. As the postconviction court found, all witnesses testified that the shackles were not visible to the jury, and no testimony was presented to show that the jury or anybody else even heard Hendrix’s shackles during the trial. As there is competent, substantial evidence to support the postconviction court’s factual findings and, further, as Hendrix has failed to show that the court erred relative to its legal conclusions, we deny this claim.
 

 Id.
 
 at 425-26. Furthermore, in
 
 Stewart v. State,
 
 549 So.2d 171, 174 (Fla.1989), this Court approved the use of shackles where they were unobtrusive, the jury had no opportunity to see the defendant walk in shackles, the shackles were barely visible under the table, and defendant was a high-risk prisoner.
 

 Under the facts of the present case, Floyd fails to establish that his counsel was deficient. Trial counsel actually objected to the proposed use of cuffs and leg shackles during the penalty phase, and
 
 *458
 
 his objection was successful. The trial court ordered that the shackles be removed and that a leg brace be used instead. With regard to this brace, there was competent, substantial evidence to support the conclusion of the postconviction court that
 
 not even trial counsel
 
 was aware of the brace worn by Floyd. The brace was attached to Floyd’s leg, and was worn under■ his pants so the only time the brace could have been seen was if Floyd sat down and his pant leg moved up. Moreover, even if counsel had been aware of the brace, it is unlikely that an objection to the use of the brace would have been successful in light of the unobtrusiveness of the restraint measure and the need to protect the occupants in the small courtroom from Floyd, who was short-tempered and had already killed two people. Furthermore, without presenting any evidence indicating that anyone in the courtroom— especially the jurors — noticed the brace, Floyd fails to demonstrate that he was prejudiced by the failure of counsel to assert further challenges. Accordingly, Floyd is not entitled to relief based on this constitutional/ineffectiveness claim.
 
 [14]
 

 III. HABEAS PETITION
 

 A. Failure of Appellate Counsel to Challenge Expert Competency on Direct Appeal
 

 Claims of ineffective assistance of appellate counsel are properly raised in a petition for writ of habeas corpus.
 
 See Freeman v. State,
 
 761 So.2d 1055, 1069 (Fla.2000). Consistent with the
 
 Strickland
 
 standard, to grant habeas relief based on ineffective assistance of appellate counsel, this Court must determine
 

 first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
 

 Cox v. State,
 
 966 So.2d 337, 365 (Fla.2007) (quoting
 
 Pope v. Wainwright,
 
 496 So.2d 798, 800 (Fla.1986)). This Court has held that “[i]f a legal issue ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.”
 
 Rutherford v. Moore,
 
 774 So.2d 637, 643 (Fla.2000) (quoting
 
 Williamson v. Dugger,
 
 651 So.2d 84, 86 (Fla.1994)).
 

 In his first claim, Floyd notes the holding of the postconviction court that the challenge to the competency of Dr. Krop was procedurally barred because it should have been raised on direct appeal. Based on this holding, Floyd claims that his appellate counsel was ineffective for the failure to raise this challenge on direct appeal. We conclude that the ineffectiveness claim is without merit because, as we determined in this proceeding, the underlying claim is without merit.
 
 See Rutherford,
 
 774 So.2d at 643.
 

 B. Ineffectiveness of Appellate Counsel and Constitutional
 
 Violation—
 
 Shackling
 

 In this claim, Floyd adopts and incorporates all claims he made in his rule 3.851 appeal based on his purported shackling
 
 *459
 
 during the penalty phase. Further, since the postconviction court found that any shackling challenges should have been raised on direct appeal, Floyd contends appellate counsel was ineffective for the failure to raise this challenge. However, as previously discussed, Floyd’s challenges to his alleged shackling are without merit. Therefore, the failure of appellate counsel to raise this challenge does not constitute deficient performance.
 
 See Rutherford,
 
 774 So.2d at 643.
 

 C.Ineffectiveness of Appellate Counsel
 
 — Failure
 
 to Challenge Qualification of the Child Witnesses
 

 As previously discussed, the process used to qualify the child witnesses and the actual qualification of those witnesses by the trial court was adequate and without error. Accordingly, had appellate counsel raised this challenge on direct appeal, it would have been rejected as meritless. We deny relief on this basis. See
 
 Rutherford,
 
 774 So.2d at 643.
 

 D.Crossover Claims
 

 Floyd next generally contends that to the extent any other matter raised in the postconviction proceeding and the appeal is not cognizable because it should have been raised on direct appeal, he adopts all facts and argument relating to that claim and incorporates these matters into his habeas petition. However, general references to other pleadings are not sufficient to preserve a challenge in a collateral proceeding.
 
 See generally Duest v. Dugger, 555
 
 So.2d 849, 852 (Fla.1990) (“Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.”). Moreover, since the claims already raised and discussed in Floyd’s postconviction appeal are without merit, raising them again in the habeas petition is unavailing.
 

 E. Eighth Amendment
 
 — Competency
 

 According to Floyd, the evidence adduced during the evidentiary hearing and discussed in the appeal from the postcon-viction proceeding demonstrates that Floyd has suffered impaired mental health since childhood. Floyd contends that his Eighth Amendment right against cruel and unusual punishment will be violated because he may be incompetent at the time of his eventual execution. We have held that no relief is warranted under similar circumstances.
 
 See, e.g., Lynch,
 
 2 So.3d at 85 (“[A] capital-incompetency claim is not ripe for review where the Governor has not signed the defendant’s death warrant.” (citing
 
 Rogers v. State,
 
 957 So.2d 538, 556 (Fla.2007);
 
 Morris v. State,
 
 931 So.2d 821, 837 n. 15 (Fla.2006);
 
 Sireci v. Moore,
 
 825 So.2d 882, 888 (Fla.2002))).
 

 F. Ineffective Assistance of Appellate Counsel
 
 — Failure
 
 to Challenge Rule that Prohibits Juror Intemetus
 

 In his final claim, Floyd contends that appellate counsel was ineffective for failing to assert that Rule Regulating the Florida Bar 4 — 3.5(d)(4), which imposes restrictions on post-trial juror interviews, violates his equal protection and due process rights as well as the First, Sixth, Eighth, and Fourteenth Amendments. However, we have repeatedly rejected claims that rule 4 — 3.5(d)(4) is unconstitutional.
 
 See, e.g., Israel v. State,
 
 985 So.2d 510, 522 (Fla.2008);
 
 Barnhill v. State,
 
 971 So.2d 106, 116-17 (Fla.2007);
 
 Farina v. State,
 
 937 So.2d 612, 626 (Fla.2006). Accordingly, appellate counsel was not ineffective for the failure to raise this nonmeritorious issue on direct appeal.
 
 See Rutherford,
 
 774 So.2d at 643.
 

 IV. CONCLUSION
 

 For the foregoing reasons, we affirm the postconviction court’s denial of the rule
 
 *460
 
 3.851 motion and deny this petition for writ of habeas corpus.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, and POLSTON, JJ., concur.
 

 LABARGA and PERRY, JJ„ did not participate.
 

 [1]
 

 . The trial court found: (1) Floyd was on probation at the time that he committed the murder (great weight); (2) Floyd had previously been convicted of a prior violent felony; i.e., voluntary manslaughter of his brother (substantial weight); (3) Floyd committed the murder while engaged in the commission of armed burglary (great weight); and (4) Floyd committed the murder to avoid a lawful arrest (substantial weight).
 
 See id.
 
 at 392 n. 17.
 

 [2]
 

 . The nonstatutory mitigating circumstances found by the trial court were: (1) Floyd displayed exemplary courtroom behavior; (2) Floyd assisted defense counsel throughout the proceedings; (3) Floyd was successfully completing his probation for other offenses before he committed the murder; and (4) Floyd expressed concern with regard to Trelane's use of alcohol.
 
 See id.
 
 at 393 n. 18.
 

 [3]
 

 .As provided in our decision, the claims were:
 

 (1) the trial judge impermissibly allowed the State to exercise a peremptory challenge against a Hispanic prospective juror; (2) the trial judge erred in denying the motion for acquittal; (3) the State failed to establish a proper chain of custody for the bullet and jacket that were removed from the victim's head, and the trial judge improperly admitted [these] items into evidence; (4) the trial judge improperly admitted hearsay evidence in the form of testimony by State witness Jeanette Figuero, and allowed Ms. Figuero to bolster the credibility of another State witness; (5) the trial judge erred in refusing to give the defense's requested jury instruction on circumstantial evidence; (6) fundamental error occurred during the penalty phase regarding the jury instructions on mitigating circumstances; (7) competent, substantial evidence did not support the trial judge's decision to instruct the jury on the heinous, atrocious, or cruel (HAC) aggravating circumstance during the penalty phase; (8) competent, substantial evidence did not support the trial judge's finding of the avoid arrest aggravating circumstance; (9) the trial judge impermissibly admitted victim impact evidence during the penalty phase, thereby compelling the jury to recommend a sentence of death; (10) competent, substantial evidence did not support the trial judge’s finding of the "committed during a burglary” aggravating circumstance; (11) fundamental error occurred during the prosecutor’s penalty phase closing argument; (12) the cumulative effect of errors occurring during the trial violated Floyd's right to a fair trial; and (13) the sentence of death is not proportional.
 

 Id.
 
 at 393 n. 19.
 

 [4]
 

 . The jury found Floyd guilty based on the theories of both premeditated murder and felony-murder.
 
 See id.
 
 at 392 n. 15. In our decision on direct appeal, we explicitly held that "[c]ompelent, substantial evidence ... supports Floyd's conviction for premeditated murder.”
 
 Id.
 
 at 402.
 

 [5]
 

 . These claims were: (1) trial counsel was ineffective during the investigative, guilt, and penalty phases; (2) Floyd was deprived of his due process right to develop factors in mitigation and a fair penalty phase because the court-appointed psychologist failed to conduct the appropriate tests for organic brain damage and mental illness, and trial counsel was ineffective for failing to protect the rights of Floyd in this regard; and (3) Floyd is entitled to a new trial due to cumulative error.
 

 [6]
 

 . The two claims for which an evidentiary hearing was not sought were: (1) Floyd was charged by a faulty indictment and deprived of a unanimous verdict; and (2) cumulatively, the combination of procedural and substantive errors deprived Floyd of a fair trial.
 

 [7]
 

 . LaJade testified that Floyd left Ms. Goss’s porch to chase the victim before firing the third shot. Conversely, J.J. testified that he never saw Floyd leave the porch.
 

 [8]
 

 . Although trial counsel initially sought to depose all three children, the request later was limited solely to J.J.
 

 [9]
 

 . This assertion was communicated to the trial court by way of the State because the entity did not receive notice that Floyd sought the records of the children.
 

 [10]
 

 .
 
 See Williams v. State,
 
 110 So.2d 654 (Fla.1959).
 

 [11]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [12]
 

 .
 
 Giglio v. United States,
 
 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
 

 [13]
 

 . Although Lamb did make somewhat inconsistent statements to the police with regard to whether Floyd arrived before or after she received the phone call from her friend, this collateral factual detail did not bear on any material element in the case. Accordingly, counsel was not deficient for failing to cross-examine Ms. Lamb with regard to this discrepancy of a collateral fact.
 

 [14]
 

 . Since we have concluded that none of Floyd's postconviction claims merit relief, we reject his challenge based upon cumulative error without further discussion.
 
 See Griffin v. State,
 
 866 So.2d 1, 22 (Fla.2003) ("[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail."). Floyd raised a similar challenge in his habeas petition, and we deny this claim as well.