WARNER, J.
Antoine Faust appeals his conviction of first degree murder with a firearm. He raises three claims of trial court error. First, he claims that the court erred in admitting prior violent acts of appellant on the ground that they were inextricably intertwined with the commission of the present crime. We agree with the trial court that the acts were relevant to show motive for committing the murder. Second, he claims that the court erred in admitting two statements of a witness as past recollections recorded, when they constituted impeachment and the state called the witness for the sole purpose of introducing the statements. We conclude that one statement was admissible as a past recollection recorded and the other as impeachment. Finally, he claims that the court erred in admitting recordings of phone calls appellant made from the jail. As the calls provided relevant evidence, the court did not abuse its discretion in admitting them. We affirm the conviction and sentence.
Faust was charged with the murder of Andre Hall, whom the state maintained Faust killed because Hall was dating Faust’s former girlfriend. One of the state’s principal witnesses was the girlfriend. Faust met the girlfriend while he was involved with another woman. However, as the relationship with the other woman broke down, the girlfriend and Faust developed their own relationship. She suspected, however, that Faust was still involved with the other woman. The girlfriend told Faust she was breaking off their relationship. When she did this, Faust threatened to kill her and anyone she was with. Nevertheless, they still communicated over social media and by phone. The girlfriend told Faust that she thought she might be pregnant. Faust was neither happy nor angry about it. Later, she discovered that she was not pregnant.
The girlfriend knew that Faust was coming to Fort Lauderdale in October and told him over social media that she was looking forward to seeing him. In the meantime, she began dating a longtime friend, victim Andre Hall. On October 19th, the girlfriend spent the day with Hall, and they went to her home for dinner. She started getting phone calls and text messages from Faust that evening while Hall was with her.
Around midnight there was a knock on the door, and the girlfriend’s mother went to the door but didn’t open it. After that, *423 there were several other phone calls which stopped around 1:00 in the morning. The girlfriend fell asleep around 2:00. At around 6:00 she walked Hall to the door. After he left, she returned to her room and heard her phone ring but didn’t answer it. Between five to ten minutes later she heard a gunshot. Ten seconds later she heard another gunshot. Her sister called 911. The police arrived and came to her apartment. She went outside once the police were there, and she saw Hall’s body.
At trial after the girlfriend’s direct testimony, the defense cross-examined her, suggesting that she was trying to entice Faust back into a relationship with her by her claim of pregnancy. She admitted having an intimate encounter with Faust two weeks before the murder. And she admitted having made 46 or 47 phone calls to Faust the morning before the murder. Significantly, when asked why her mother disliked Faust, the girlfriend testified that she wasn’t allowed to get into the reasons for that.
On redirect examination, the state argued that the defense had opened the door to bringing in Faust’s prior violent conduct towards the girlfriend to explain her conduct towards him. The state suggested that the girlfriend had been painted as being jealous of Faust, but the prosecutor argued that she was more scared of Faust than in love with him. Further, the defense had asked about the mother’s animosity to Faust, reasons for which the girlfriend told the jury she could not explain. Over a defense objection, the trial court permitted the girlfriend to testify on redirect that she was scared of Faust because of his prior acts of violence towards her. The court would not let the state delve into the number or kinds of acts of violence.
The girlfriend’s mother also testified. She was at home on the night of the incident and received cell phone calls from some woman, but she could hear Faust’s voice on the line. Around 6:15 in the morning, she received another call. She could not hear any voices but heard scuffling and then a gunshot. At the same time she heard a gunshot outside her home. She hung up and called back *69 to determine that the last call was from Faust’s phone. This was confirmed by cell phone records admitted in evidence.
On the morning of the murder, a family friend of Faust found Faust in her living room when she woke up. The family friend lived only a block or two from the girlfriend’s house. Faust asked to stay until someone came to pick him up. She went back to bed, but when she got up again, Faust was still there. She had a conversation with him, and he asked her whether, if someone said he had done something, he could be arrested. Later in the day, while Faust was still there, she found out that someone had been killed a street over from her home. Faust received a call on his cell phone from a detective, and the family friend discovered that the police had her home surrounded. Faust surrendered to the police at her home. The family friend then gave the police permission to search her house, which included the attic. She did not see them remove a gun.
During direct examination, the state asked the family friend whether she remembered seeing Faust go into the attic. She said she did not but did see him on a chair at the attic entrance. She also denied hearing Faust tell her that the girl he was dealing with said that he shot and killed someone. The state then attempted to refresh her recollection with a statement she made to police the day of the incident. The family friend recognized her voice on the audio statement, but it did not refresh her recollection of the statement. *424 She did admit that when she spoke to the police on that occasion she spoke the truth, and her memory at that time of the incident was better than her memory at the time of trial.
The state also questioned the family friend about her boyfriend and cousin’s subsequent search of her home for a gun. At trial she testified that they searched the home, but she did not see a gun. The prosecutor then produced a second statement that she had given to police about two weeks after the murder. In that statement she told police that the men had searched her home and removed a gun. Again, even though she identified her voice on the audiotape, she could not recollect her answer regarding the gun. With respect to this statement, however, the family friend testified that her present memory was that she had not seen a gun.
Over objection, the state also introduced recordings of Faust’s telephone calls from jail to an unidentified woman (who apparently was “the other woman”) the day after the murder and one a few days later. In the calls, Faust told her to ask the family friend’s nephew to look for “the thing” and to ask another friend to vouch for him that he had been at her house the entire night before the murder. In the second call, Faust asked if the “money” and “books” had been gotten rid of, because that would save his life.
The cause of the victim’s death was two gunshot wounds to the head and chest. No gun, however, was ever found. On this evidence, the jury convicted Faust of first degree murder with a firearm. He was sentenced to life in prison and now appeals.
In his first issue on appeal, Faust claims that the court erred in allowing the state to ask the girlfriend on redirect about prior acts of violence against her. He claims that these were not inextricably intertwined with the event and brought up collateral issues, unrelated to the charges in this case. We should first note that at trial the thrust of the defense claim was to avoid getting into the specifics of the various violent acts against the girlfriend, particularly one occurring about a month and a half prior to the murder where the girlfriend alleged that Faust choked her into a state of unconsciousness after their breakup.
With respect to the verbal threats by Faust, to which the girlfriend testified on direct examination, these provided a motive for the murder of Hall. Faust threatened to kill both the girlfriend and anyone she was involved with. This is nearly identical to Floyd v. State, 18 So.3d 432 (Fla.2009), which involved a husband’s threat to kill his wife, or someone she loved, as a reprisal for her drinking or if she attempted to run or hide from him. The supreme court held that the threat demonstrated the motive behind the murder of the wife’s mother and was inextricably intertwined with the murder. Similarly, Faust’s threat to kill anyone with whom his girlfriend became involved provides the motive for the murder of Hall.
Faust also objects to the state being allowed to ask the girlfriend on redirect whether she was scared of Faust and whether he had committed prior acts of violence against her. In Sinclair v. State, 50 So.3d 1223, 1226 (Fla. 4th DCA 2011), we explained:
The concept of “opening the door” permits admission of inadmissible evidence for the purpose of qualifying, explaining or limiting testimony previously admitted. This concept is based on considerations of fairness where “redirect examination reveals the ‘whole story of a transaction only partly explained’ in cross examination.”
*425 (citations omitted). By allowing the limited questioning of the girlfriend regarding her claim that she was the victim of prior acts of violence by the defendant, her testimony explained in some sense why the mother disliked Faust, a topic brought up, but not satisfactorily explained, in cross-examination. Further, the fact that she feared Faust was necessary to explain why she continued to see Faust on occasion even though she had broken off with him. The court appropriately did not allow specific acts of violence, or the number of them to be introduced, because such evidence may have been overly prejudicial. The trial court did not abuse its discretion in admitting this very limited redirect examination.
In the second issue, Faust contends that the prior statements given by the family friend to the police were improperly admitted as past recollections recorded. From our reading of the record, it appears that the first statement given the day of the incident was admitted as a past recollection recorded, but the family friend’s second statement regarding the gun was offered by the state as impeachment of her trial testimony. The trial court did not abuse its discretion in admitting either statement.
Section 90.803(5), Florida Statutes, provides an exception from the hearsay rule for the admission of prior statements as recorded recollections:
(5) Recorded recollection. — A memorandum or record concerning a matter about which a witness once had knowledge, but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made by the witness when the matter was fresh in the witness’s memory and to reflect that knowledge correctly. A party may read into evidence a memorandum or record when it is admitted ....
A witness who has no present memory of a statement must testify that he or she knew at the time of the making of the statement that it was accurate. See Montano v. State, 846 So.2d 677, 681 (Fla. 4th DCA 2003); Kimbrough v. State, 846 So.2d 540, 544 (Fla. 4th DCA 2003). Here, the family friend testified that, as to the first statement, she remembered giving the statement to the police but did not remember her specific answers as to some questions. Nevertheless, she testified that she gave accurate and truthful information to the police at the time, and her memory was better concerning the events at the time of the statement than when she was testifying. Therefore, the first statement was admissible as a past recollection recorded.
As to the testimony with respect to her seeing a gun removed from her home after a search by her boyfriend and cousin, this statement was admissible as impeachment. Section 90.608(1), Florida Statutes, permits the impeachment of a witness through the introduction of statements inconsistent with the witness’s trial testimony. In this case, the family friend testified at trial that she did not witness any gun being removed from her home. When confronted with her prior statement, she admitted having given a statement to the police. She affirmatively stated that she did remember the search by her boyfriend and cousin, and she did not see a gun. What she did not remember was her statement to the police regarding seeing a gun. She admitted that her prior statement was inconsistent with her present testimony. On cross-examination, she clearly stated that she did not see a gun and that any prior statement that she did would have been inaccurate and prompted by fear of her situation. Thus, the introduction of her second statement to the police regard *426 ing seeing the gun was proper as impeachment. See Rodriguez v. State, 65 So.3d 1133, 1135 (Fla. 4th DCA 2011).
While Faust also complains that the state called the family friend solely for the purpose of impeaching her, we find that this is patently not the case. Not only were some of her statements permissible as recorded recollections, she offered other testimony relevant and not covered by either of the prior statements. The trial court did not abuse its discretion in admitting these statements.
Finally, Faust objects to the admission of the recordings of the jail phone calls. On appeal, he argues that the evidence was unduly prejudicial and in violation of section 90.403, Florida Statutes. The admission of evidence is reviewed for an abuse of discretion, limited by the rules of evidence. Hudson v. State, 992 So.2d 96, 107 (Fla.2008); Essex v. State, 917 So.2d 953, 956 (Fla. 4th DCA 2005).
The audio recordings were relevant. The recordings suggested that Faust was using code words to direct others to get rid of a weapon on the day after the murder. He referred to “that thing,” “the money,” “my books,” and “the coupons,” and told the woman to dispose of them as soon as possible because his life depended on it. Such conversations were admissible as they tended to show consciousness of guilt. See Hayward v. State, 24 So.3d 17, 38-39 (Fla.2009).
For the foregoing reasons, we affirm the conviction and sentence.
DAMOORGIAN and CONNER, JJ., concur.